IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.: 21-cr-53-RM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.      ETHAN COLLINS,

        Defendant.

---

### EMERGENCY MOTION FOR STAY AND REVIEW OF RELEASE ORDER

---

The United States of America respectfully requests that the district court grant this Emergency Motion for Stay and Review of Release Order. For the reasons set forth below, the Government asks the district court (the court with original jurisdiction in this matter) to stay the release order issued in the District of Utah and schedule a hearing in this district for a review of the defendant's release conditions. **The defendant will be released as early as 10:00 a.m. tomorrow (Friday, February 19, 2021) unless a stay is granted.**

### PROCEDURAL BACKGROUND

On February 2, 2021, U.S. Magistrate Judge Kristen L Mix signed a criminal complaint that charged the defendant with violating 18 U.S.C. §§ 5861(d) (unlawful possession of silencers), (f) (unlawful manufacture of silencers), and (i) (possession of silencers without a serial number). [Dkt #1]. On February 17, 2021, the defendant was indicted in the District of Colorado in six counts. [Dkt #4]. Counts One through

Three charge him with unlawful possession of silencers, in violation of 18 U.S.C. § 5861(d) and Counts Four through Six charge him with unlawful possession of silencers without serial numbers, in violation of 18 U.S.C. § 5861(i). [Dkt #4].

The defendant was arrested in the District of Utah on February 8, 2021 and had his initial appearance there on February 18, 2021.[1]   [D. Utah docket 21-00088M-001]. At the undersigned Assistant United States Attorney's request, the Government in the District of Utah sought the defendant's detention in that district.   On the afternoon of February 18, 2021, a magistrate judge in the District of Utah ordered that the defendant be released with conditions.   Among other things, these conditions include GPS monitoring; the defendant shall reside with his parents in South Carolina; no travel out of South Carolina without the Probation Office's permission; surrender passport within 15 days; no visiting or obtaining items from his Denver-area apartment without the Probation Office's permission; and seek mental health counseling.   No home inspection of the parents' house in South Carolina has been ordered prior to the defendant's release.

The defendant will be released as early as 10:00 a.m. tomorrow (Friday, February 19, 2021) if a stay is not granted.

## LEGAL FRAMEWORK

"If a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court—the attorney for the Government may file, with the court having original

---

[1] The delay between arrest and initial appearance was occasioned by lack of bedspace in local jails.

jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release."   18 U.S.C. § 3145(a)(1).   The court of "original jurisdiction" over the offense is the district court.   See *United States v. Cisneros*, 328 F.3d 610, 615-16 (10th Cir. 2003) ("It is clear from the wording of Section 3145(a) that 'a court having original jurisdiction over the offense' must be interpreted as the district judge assigned to the case . . . .   [T]hat section suggests a hierarchy for reviewing a magistrate's decision.   In other words, Section 3145(a) authorizes a district judge to review a decision made by a magistrate judge, but it does not confer the same authority upon a magistrate judge in the charging district when the challenged order was issued by a magistrate judge in the arresting district."); *see also, e.g.*, *United States v. Fitzhugh*, 2016 WL 4727480, at *2 (E.D. Mich. Sept. 12, 2016) ("[A]lthough the Northern District of California conducted the initial detention hearing, the Criminal Complaint was issued in the Eastern District of Michigan.   Therefore, this [District] Court has original jurisdiction and thus jurisdiction to review the California Magistrate's Release Order.).   The district court with original jurisdiction exercises *de novo* review of a magistrate judge's release order.   *Cisneros*, 328 F.3d at 616.

The district court may stay the release order prior to making a detention determination.   See *United States v. Muhtorov*, 702 Fed. Appx. 694, 698 (10th Cir. 2017) (noting that the Tenth Circuit had granted the government's emergency stay of the release order); *see also*, *e.g.*, *United States v. Bailey*, Case No. 18-y-00089-RBJ (D. Colo. Sept. 27, 2018) ("The Court orders a stay of the release order issued by the magistrate judge in the Northern District of Georgia on September 25, 2018 until such time as this Court has the opportunity to further review the matter."); *United States v.*

*Ruiz-Corral*, 338 F. Supp. 2d 1195, 1196 (D. Colo. 2004) (revoking magistrate judge's release order and noting that the district court had previously granted the government's emergency motion for a stay).

A defendant may be detained pending trial if a "judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The factors relevant to assessing whether a defendant should be detained are (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger the defendant would pose if released. 18 U.S.C. § 3142(g).

The Government bears the burden of proving risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or to the community by clear and convincing evidence. *Cisneros*, 328 F.3d at 616.

**OFFER OF PROOF IN SUPPORT OF DETENTION**

There are no conditions or combination of conditions that will reasonably assure the defendant's appearance and the safety of any other person and the community. As discussed below, the 18 U.S.C. § 3142(g) factors counsel strongly in favor of detention. In sum, the defendant is an extremist who has expressed a desire to blow up Denver's power grid, and who built bombs and lived in an apartment laden with guns and ammunition. When he was finally caught by the FBI, he was in a car in a rural area of Utah, with food, water, guns, ammunition, and a sleeping bag, apparently ready to hide from law enforcement for as long as necessary.

### A. The nature and circumstances of the offense are serious.

On January 29, 2021, the FBI's Joint Terrorism Task Force ("JTTF") executed a search warrant at the defendant's home in Centennial, Colorado. The circumstances leading up to the execution of the search warrant are recounted in detail in the complaint affidavit. [Dkt #1]. But, in short, the defendant was a commercial pilot who had applied for a job with Customs and Border Protection's aviation division. During the job application process, the defendant sat for a polygraph interview, which he failed. The polygraph examiner subsequently interviewed the defendant and, during this interview, the defendant said the following things:

- In early 2020, COLLINS began research and formulating a plan to sabotage ("take down") the electrical power grid in Denver, Colorado. COLLINS admitted to studying power transmission lines and towers to determine what weaknesses they had. Being made of steel, COLLINS believed some type of powerful explosion would be needed to destroy them, but he did not have access to such explosives.

- COLLINS also studied power grid maps and blueprints found on open source websites on the internet. COLLINS identified several key locations he believed could be disrupted and blackout Denver and cut 80% of power to the state of Colorado. COLLINS stated that he believed that the power stations he identified operated using General Electric Natural Gas turbines and could be disabled by throwing a wrench or some other large metallic object into the turbine. COLLINS said that his work and experience as a pilot provided him with familiarity with turbines.

- COLLINS said that he scouted some of the key locations he identified and took pictures of power facilities in the Denver area using the camera on his phone.

- COLLINS initially stated he did not proceed with the plan because cutting off the power would likely lead to a great loss of life and many of those who would die would be civilians and would not target only government and law enforcement. Later, COLLINS admitted the reason he did not proceed with the attack is because he did not have the necessary manpower and support he needed to carry out his plan.

- COLLINS stated he had a detailed plan physically saved to his computer hard drive but would not confirm if it was on his laptop currently in his possession or another computer he owned.   COLLINS had no definite date for his attack on the power grid but believed it needed to occur during a snowstorm to cover his actions.   COLLINS described his plan in detail, including the number of personnel and vehicles he believed he would need.   COLLINS explained that he would need 72 people and 11 vehicles, split into teams, to carry out his attack.   Each team would operate independently and would not be in communication during the attack so they could not provide information to law enforcement about the other teams.

- One part of COLLINS's plan was to create a distraction.   The distraction was to be an explosion on a freeway that would draw law enforcement resources far away from the real targets.

- COLLINS also identified the Federal Reserve building in Denver, Colorado as a potential target.   The Federal Reserve was targeted because COLLINS believes that the actions taken by the Federal Reserve in the past year, which he described as printing 30% of all money in circulation, was intended to create inflation that would cripple the U.S. economy and leave much of the country in poverty.

- COLLINS also identified Data Centers for the state of Colorado as another target.   COLLINS was able to find the locations and other information about the data centers through IP addresses found on the Colorado Department of Revenue website.   COLLINS denied hacking into the site but stated he was very good with computers.   COLLINS targeted the data centers because they contained all the Colorado driver's license information for the state of Colorado.   COLLINS believed if the data centers were taken down, driver's license information would not be available for law enforcement to see who you were.

- COLLINS also identified police stations in Denver as potential targets so it would be difficult for law enforcement to respond to his planned power outage if their facilities were not operational.

- COLLINS said that, because of the COVID-19 shutdowns and restrictions, his hours as a pilot have been cut and his salary has been reduced by 55%.   COLLINS distrusts government and law enforcement and the COVID-19 restrictions has caused an increase in anger toward both.   He began formulating his plan to disrupt the power grid around the time the COVID-19 shutdowns began.

6

- COLLINS shared his admiration for the terrorist group ISIS because they had the courage and conviction to bring their vision of a society into existence through force.   COLLINS said that he strongly disagreed with their ideology and their use of torture, rape, and murder, but he admired that they took decisive action and were able to form their own society.

- COLLINS discussed the bombing in downtown Nashville that occurred on Christmas day 2020.   COLLINS felt that the bomber was not a terrorist because he did not target innocent civilians.   He described the bomber as a genius.

- COLLINS also shared his opinion on the recent plot to kidnap Michigan Governor Gretchen Whitmer.   COLLINS stated that those plotting to kidnap the Governor would be justified in doing so if they arrested her and put her on trial for violating their rights as American citizens.

- COLLINS believes that somebody who targets only the government or law enforcement should not be considered a terrorist and only those who intentionally target innocent civilians are terrorists.   COLLINS considers himself as a patriot, not a terrorist, but at one point during the interview did state he felt he was a terrorist.   COLLINS said he has spent a lot of time thinking about how easy it would be to shutdown major infrastructure, which might be necessary in the case of a tyrannical government.   COLLINS is not sure if the country has reached that point yet but if it has not it will soon.

- COLLINS was asked what he would do if hired by the Federal Government Agency, given that he feels the government was taking away his rights.   COLLINS stated that "you would need to watch your back" and that he upholds the Constitution.   COLLINS said that the Federal Government Agency's mission is one of the few government duties that is legitimate and that 80% of the government should be abolished.

During execution of the on January 29, 2021 search warrant, agents located a number of firearms and over 2,000 rounds of ammunition in the defendant's apartment. They also located three firearms silencers—two were in the defendant's bedroom in bags and one was on a bookshelf in the living room.   None of the silencers are registered to the defendant in the National Firearms Registration and Transfer Record

and none of them have serial numbers.

Finally, silencers are "firearms" pursuant to 26 U.S.C. § 5845(a) (*see* 18 U.S.C. § 3142(g), explaining that whether the offense "involves . . . a firearm").

### B. The weight of the evidence is strong.

The Government's evidence in this case is extremely strong.   As recounted above, the silencers were found in the defendant's apartment, including in his bedroom.   In addition, during the execution of the search warrant, the FBI interviewed the defendant.   During this interview, the defendant admitted that he made the silencers, and that's why they were not registered.

Further supporting the Government's case, there is evidence of the defendant's possession of the silencers prior to January 29, 2021.   First, agents interviewed a friend of the defendant's, who told agents that in late 2020, the friend went to the defendant's house where they chatted about life and guns.   During that visit, the defendant showed his friend one silencer and talked about having two others.   The friend described the silencer to the FBI and it is similar to the ones located on January 29, 2021.

Second, agents have begun searching some of the defendant's electronic devices pursuant to a search warrant.   On the defendant's phone, agents located a photo of what appears to be the contents of a "bug-out bag" from November 20, 2020.   Depicted that photo are what appears to be one black silencer similar to the silencers located in the defendant's home, and a two-pouched commercially available silencer holder, seen here:



### C. The defendant's history and characteristics weigh heavily in favor of detention.

The defendant's history and characteristics further establish that he must be detained.  As an initial matter, the narrative recounted above regarding the defendant's plans to destroy the Denver power grid and blow up various Government buildings is extremely disturbing.  His admiration for ISIS, the Nashville bomber, and the individuals who tried to kidnap Governor Whitmer are equally alarming.  Moreover, though the forensic review of the defendant's devices is ongoing, it is clear that he searched on Google Maps for the Cherokee Generating Station, a power station just north of I-70 in Denver.  This alone should give the Court serious pause about releasing the defendant.

There are additional facts about the defendant, however, that counsel against his

9

release.   The same night of the January 29, 2021 search warrant, the defendant left town with his brother, who was visiting him for a few days.   The next week, FBI agents went back to his apartment with another search warrant to retrieve the guns and ammunition that had been left behind during the first search warrant.   By the time FBI got there, however, the defendant and his guns and ammunition were gone.   What the defendant had left behind, however, was a plastic bag in the backyard shed that the homeowner (the defendant's landlord) said she thought was "fireworks" that the defendant had made.   The FBI got a search warrant for the bag and examined it.  Initial examination revealed chemicals consistent with bomb-making.   Ultimately, the Arapahoe County bomb squad was deployed to safely retrieve the items, which were later denoted at a range.   Witnesses in the case confirm that the defendant has been seen on making and detonating explosives.

Though the defendant is an extremist, he is not dumb.   Rather, until January 29, 2021, he was a commercial pilot for a small regional airline.   On January 29, however, he lost his job and is currently unemployed.

In short, the defendant is an unemployed anti-Government, terrorist-sympathizing extremist with a penchant for explosives and what appears to be an obsession with guns and ammunition.   His characteristics make him both a danger to the community and a risk of flight.

### D.  The defendant poses a serious danger if released.

For all of the reasons above, there are compelling reasons to believe that the defendant poses a danger to the community.

### E.  The defendant is a risk of flight.

The defendant poses a serious risk of flight if released, and GPS monitoring is no guarantee that he will appear as required.

As described above, immediately after execution of the January 29, 2021 search warrant, the defendant and his brother left Denver. Over the next week, the FBI invested substantial resources into locating the defendant, who was on the run with a car full of guns and ammunition. During this search, the defendant's brother contacted the FBI and tried to "resolve" the matter, but would not tell the FBI where the defendant was located.

Ultimately, on the afternoon of February 8, 2021, the defendant was arrested in a rural part of Utah about four hours outside of Salt Lake City. The arrest was fortuitous. On that date, the defendant approached a jogger on a remote dirt road in rural Utah to ask directions to a local lake. The jogger happened to be an FBI who knew to be on the lookout for the defendant and his car. After the encounter, the FBI agent called the local sheriffs, who arrested the defendant in the wilderness without incident. In the defendant's car, officers located guns, ammunition, a sleeping bag, and ample food and water. In short, it appeared the defendant was preparing to hunker down for some time.

GPS monitoring is no guarantee that this defendant—apparently well-versed in bug-out bags and survival skills—will remain at his parents' house during the pendency of this case. Rather, he poses an immense risk of flight and should be detained.

## CONCLUSION

The Government requests that this Court stay the District of Utah's release order and set a hearing on the issue of detention in the District of Colorado because the defendant poses both a flight risk and a danger to the community.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By: *s/ Andrea Surratt*
Andrea Surratt
Assistant U.S. Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
 (303) 454-0100
Andrea.Surratt@usdoj.gov