1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO

2

3    Criminal Action No. 21-cr-53-RM

4    UNITED STATES OF AMERICA,

5        Plaintiff,

6    vs.

7    ETHAN JEFFREY COLLINS,

8        Defendant.
     _____

9    **REPORTER'S TRANSCRIPT**
     SENTENCING HEARING

10   _____

11       Proceedings before the HONORABLE RAYMOND MOORE, Judge,

12   United States District Court for the District of Colorado,

13   occurring at 9 a.m., on the 3rd day of March, 2022, in

14   Courtroom A601, United States Courthouse, Denver, Colorado.

15   **APPEARANCES**

16       Andrea Surratt, Assistant U.S. Attorney, 1225 17th

17   Street, Suite 700, Denver, Colorado, 80202, appearing for the

18   Government.

19       David Kraut, Assistant Federal Public Defender, 633

20   17th Street, 10th Floor, Denver, Colorado, 80202, appearing for

21   the Defendant.

22

23       TAMMY HOFFSCHILDT, FCRR, CRR, RMR, Official Reporter
             901 19th Street, Denver, Colorado 80294
24       Proceedings Reported by Mechanical Stenography
             Transcription Produced via Computer

25

1

## P R O C E E D I N G S

2      (In open court at 9:00 a.m.)

3          THE COURT:  Please be seated.  21-cr-53, United States

4   versus Ethan Jeffrey Collins.  We're here today for sentencing.

5   Let me take appearances, beginning with the government.

6          MS. SURRATT:  Good morning, Your Honor.

7   Andrea Surratt, for the government, and with me at counsel

8   table is Special Agent Brian Schmitt of the FBI.

9          THE COURT:  Good morning to each of you.

10         MR. KRAUT:  Good morning, Your Honor.  David Kraut,

11  appearing on behalf of Mr. Collins.  He appears in custody here

12  today.  Mr. Collins' parents are here in the courtroom.

13         THE COURT:  Good morning to you, to Mr. Collins and to

14  everyone else who is in the courtroom.

15         All right.  Before proceeding, at this time I formally

16  accept the Plea Agreement, pursuant to which the plea of guilty

17  was made back in November.

18         Although I know the answer, Mr. Kraut you know I'm

19  going to ask, so, have you received a copy of the Presentence

20  Investigation Report and the addenda, and had sufficient time

21  to review those matters and to discuss them with your client?

22         MR. KRAUT:  Yes, Your Honor.

23         THE COURT:  All right.

24         THE COURT:  Ms. Surratt, is the same true for the

25  government?

1         *MS. SURRATT:*  It is, Your Honor.

2         *THE COURT:*  I have been given a -- what I will call

3    affectionately, a dummy's guide to what has been filed by

4    Mr. Kraut, but let me just make sure that I have gotten

5    everything that has been filed by the parties.

6         Let me start with the government.  The government

7    filed a Rule 48 Motion To Dismiss Counts, that's **ECF Number 68;**

8    that motion is granted.  The government also filed for the

9    third point for acceptance of responsibility, that's **ECF Number**

10   **69**, that motion is also granted.

11        Beyond that, what the government filed were two

12   things; number one, a response to the defendant's objections to

13   the Presentence Investigation Report, and then number two, a

14   sentencing statement.  Obviously, if the government filed a

15   response to the defendant's objections to to the Presentence

16   Investigation Report the defendant filed objections to the

17   Presentence Investigation Report, and Mr. Kraut also filed, on

18   behalf of Mr. Collins, a Motion For Non-Guideline Sentence, and

19   then, what I referred to earlier, I believe, is the sentencing

20   exhibit table, but it's simply to make sure that the various

21   letters and other, for lack of a better term, third-party

22   matters, whether they be letters or report -- reports or

23   otherwise were all identified as to where they could be

24   located, and they are attached to the various pleadings,

25   including the Presentence Report and the addendum, and I have

1    looked at all of it, and frankly I have looked at all of it

2    more than once.

3          Let me start and make sure I have not missed anything.

4    For the government?

5          MS. SURRATT:  You are not missing anything,

6    Your Honor.

7          THE COURT:  For the defendant?

8          MR. KRAUT:  Yes, Your Honor.  You have accurately

9    described everything that has been filed.  I want to make a

10   quick note, now, because the sentencing hearing was

11   continued --

12         THE COURT:  Yeah.  I'm aware of that.  What you are

13   going to say is that the -- the total days that the Presentence

14   Report states is short, and you have done some calculation as

15   to what it is up to, today.  Okay.  You can tell me, but I

16   don't include, even if I were to give a sentence of

17   incarceration, I don't make recommendations as to specific

18   days, because, to be honest with you; one, they're going to

19   ignore me and do it themselves; and two, I don't want do the

20   math, but you have done it, so let's get it on the record.

21         MR. KRAUT:  I believe he has got 388 days of

22   presentencing confinement, including today.

23         THE COURT:  And that would be -- the difference would

24   be the time from February 11 until now, I believe?

25         MR. KRAUT:  That's right.

1          THE COURT:  Okay.  All right.

2          MR. KRAUT:  Thank you.

3          THE COURT:  So, let's start with the objections.  And

4    I am going to do it not in the order of importance; and what I

5    mean by that is, I know there's an objection and a discussion

6    as to whether we're talking about one silencer or three, and

7    the reason that that is an issue is that if it's one, then the

8    base offense -- then there's no specific offense characteristic

9    that applies for a number of firearms.  If there are three,

10   then the two-level increase, and so we're talking about a 20

11   minus three versus a -- 17 versus a 15, is, ultimately, I think

12   what we're talking about.

13          Let me put that to the side for the moment, and

14   instead focus on the remaining objections, all of which, I

15   think are -- with one exception -- all of which are resolved or

16   moot.  The one that I park, as well, is the objection, and I am

17   not sure that I will see it right away, staring at the

18   document.  In fact, I'm sure I won't.  But it's the objection

19   with regard to the fact that the Presentence Report notes that

20   Mister.... I think it's Wesley, made a statement to law

21   enforcement about conversations that he had with Mr. Collins.

22   I understand you object to that.  It, of course, is tied to the

23   issue of the number of firearms.  So I'm going to park that, as

24   well, and try and brush out the -- the other matters, which, I

25   think, are quite simpler -- or much simpler.

1              In fact, my understanding is that all of the remaining

2     objections either have resulted in a -- a change in the

3     language of the Presentence Investigation Report or additional

4     language being used, and what I'm talking about are there are

5     things that were objected to ... courses of education, in

6     paragraph five, the description of a failed polygraph in

7     paragraph 11, his relationship with the UADF, in paragraph 19.

8     The -- whether that holster device was for silencers or laser

9     scopes, in paragraph 25.  In paragraph 29, there's further

10    discussion about rocket candy.  In paragraph -- paragraph 30 is

11    the one that I said I would park, as well, the Jacob Wesley;

12    but skipping over that, paragraph 72 his vaccine status, and

13    then a -- an objection to a proposed special condition of

14    supervised release, where, in essence, what Mr. Kraut wanted me

15    to do was to include an additional matter, if you would, the

16    preapproved computer uses; probation was fine with it, I'm fine

17    with it, as well, and so I think all of these that I have just

18    recited are moot at this point; but I could be wrong.

19             *MR. KRAUT:*  I agree, Your Honor.  I don't intend to

20    make any further record on those objections, and I do agree

21    that the Presentence Report, in its final iteration, has been

22    modified.

23             *THE COURT:*  All right.  So, let's then go to the

24    objection, which is the one that I said before, which is

25    whether or not it's one or three silencers.  There is extensive

1    argument, I almost feel like the argument is more precise or

2    involved than it needs to be.  I'm going to tell you that my

3    inclination is to overrule the objection.  I'm going to tell

4    you why, and then I will give you each an opportunity to

5    respond to that, rather than just kind of opening argument on

6    the front end of it, because I don't -- because each of you has

7    extensively briefed the issue.  I have looked at it all, and

8    ultimately, where I come down, is fairly simple compared to

9    some of the analyzes that are being urged on me.

10           On the video, which I have looked at, now, multiple

11   times, there is a statement that both parties report, in their

12   respective filings, and I think the only difference is, *Do you*

13   *have paperwork for two silencers* versus *Do you have paperwork*

14   *for the two silencers*.  I think that's the only difference in

15   your recitations, and I will tell you that I have heard it both

16   ways.  I mean there's a stumble in the voice.  I don't know

17   whether it's just simply *two* or *the two*.  It really doesn't

18   matter.  The answer is, no, and then Mr. Collins, essentially,

19   says that he made them, but he wasn't going to -- he didn't

20   have any plans to do anything with them, or words to that

21   effect.

22           I acknowledge that it was not said, *Do you have*

23   *paperwork for the three silencers*; but the fact is, the

24   discussion was about more than one.  He acknowledged awareness

25   of more than one.  He acknowledged, at least, the ability to

1   control more than one and he indicated that he made them.

2           Look, it could be a lie, but on what I have got is the

3   evidence that's before me, and that's the statement that's

4   made.  Now, I have got Wesley saying, to law enforcement, a few

5   things, some of which the defendant has been happy with, over

6   the course of these proceedings, and I go all the way back to

7   the appeal of bond issue, and I believe, at that point, things

8   were in their early stages, but we're talking about, among

9   other things, whether or not this, and I will use air quotes,

10  explosive, found on the second search warrant, was or wasn't,

11  potentially, something to use for bomb-making versus rockets,

12  and I heard from Mr.-- that Mr. Wesley had acknowledged, you

13  know, being with Mr. Collins around New Year's Eve and making

14  and setting off homemade fireworks; at least I believe that was

15  Mr. Wesley.

16          In any event, Wesley says that the defendant had three

17  silencers or -- excuse me -- that the defendant said he had

18  three silencers.  Wesley said he saw one.  Wesley also said

19  that Collins had a tactical vest and chest plates, according to

20  Collins.

21          After the searches, we know there were three

22  silencers.  There was a tactical vest.  There were chest

23  plates.  So, it seems to line up, well, with what the evidence

24  is.

25          Now, there's been a couple of things that have been

1   suggested, and I don't find either of them compelling.  Number

2   one is that I shouldn't trust this, because, in some way, it's

3   too amorphous, there's not a particular date in the agent's

4   report as to when Wesley supposedly said this or didn't say

5   this.  I grant you that that's true, but what he did say, was

6   that it was a month or two before New Years, somewhere in that

7   timeframe, and that's pushing this back into November,

8   somewhere around there.

9          Well, on the other hand what I have is the statement

10  that, well, these are his -- Mr. Collins' brother's silencers,

11  Calvin's.

12         Well, when did Calvin get there?  Because if the

13  silencers are there, before Calvin gets there, I'm done.  I --

14  based on what I see, I'm done.  I know when -- when Calvin got

15  there, because he was interviewed, and in **Document 56-1**, the

16  summary of that interview with the public defender's

17  investigator is included, and Calvin says he got there two or

18  three days before the search.

19         So now I have somebody saying that Mr. Collins said

20  there are silencers.  What that person says is accurate, in

21  terms of what is found on the ground, at the time of the

22  search.  It matches with Mr. Collins' statement, himself,

23  that -- to the effect of he, quote, made them, and certainly to

24  the effect that he had an awareness of the silencers, and did

25  not plan to mess around with them, or whatever the term was,

1    that he used.  His prints are on one of them, and all three are

2    found in his -- in his residence.

3         There's also a subtle suggestion, and I comment on it,

4    to be clear, I don't criticize people for making the

5    suggestion, I just want to make it clear, I reject it.  There's

6    some suspicion or suggestion that that agent's report should

7    not be trusted.  It's not particularly clear to me why.  I

8    don't know of any animosity or, frankly, any reason the agent

9    would have to falsify that; and so, rather than get bogged down

10   into whether or not it's actual possession, constructive

11   possession on the day that the search occurred, I know that

12   within the timeframe that would clearly be relevant conduct

13   timeframe, the silencers are there and Calvin is not, and if

14   the silencers are there and Calvin is not, I don't need to get

15   into parsing this down into whether or not, if somebody tried

16   to have a search warrant, they could have looked in the bag or

17   couldn't have looked in the bags or government's view that,

18   even if it is in the bags, it's actual as opposed to

19   constructive.

20        The fact of the matter is the evidence that I have

21   before me is very clear with regard to two things; there's a

22   third-party statement that takes the silencers out of the *They*

23   *are Calvin's* explanation; that third-party statement is

24   consistent with what's found on the ground; that third-party

25   statement is consistent, to a degree, to the statements that

1   Mr. Collins -- Mr. Ethan Collins made, at the time of the

2   search, and to be clear, I don't trust a thing that Calvin

3   Collins is saying, anyway.

4        Before, it was, *he owned them all*; then it was, *He*

5   *owned one*; I don't know.  But I don't have to decide it on the

6   basis of anything other than the evidence that I have before

7   me, and the evidence that I have before me establishes, by a

8   preponderance, that the additional two silencers are relevant

9   conduct, and that's the way I see it, for the record.

10       And, obviously, what that means is I'm overruling the

11  objection as to the inclusion of Mr. Wesley's statement.  I'm

12  also overruling the objection as to the two-point enhancement

13  for three or more firearms.  Government.

14       *MS. SURRATT:*  Yes, Your Honor.  The government

15  certainly agrees with that analysis.  I expect we're going to

16  hear from Mr. Kraut --

17       *THE COURT:*  Well, I will give you another shot.  What

18  I'm saying is, you don't need to anticipate, but let me -- let

19  me hear from Mr. Kraut, and then we will see whether your

20  expectations are correct.

21       *MS. SURRATT:*  Sure, Your Honor.

22       *THE COURT:*  Sir, please.

23       *MR. KRAUT:*  Thank you very much, Your Honor.  Because

24  the Court has focused on Mr. Wesley's statement, I will do the

25  same, and I think it's important to begin with the actual

1    statement that's reported in Agent Schmitt's report, which is

2    that, Mr. Wesley stated that Mr. Collins, quote, talked about

3    having three, unquote, silencers.  The -- the only reason I

4    mention that the statements were unrecorded, was not to subtly

5    imply that the agent has misreported what Mr.--

6              THE COURT:  You wouldn't be the first one to do that,

7    and I don't mean that as an indictment of you, so to speak.  My

8    assumption is that if that's what you thought you needed to do,

9    then that's what you thought you needed to do, and my

10   assumption would further be that I hope his skin is thicker

11   than that.

12             MR. KRAUT:  Right.  And I am certain that it is.  The

13   reason I noted that they are unrecorded, because that

14   particular quote, while I believe it's accurate -- accurately

15   reported by Agent Schmitt, leaves quite a bit of room for

16   interpretation, and a full recording of the interview with

17   Mr. Wesley may have provided some additional context or

18   insight.

19             THE COURT:  True.

20             MR. KRAUT:  So, when we look at this quote, saying

21   Mr. Collins talked about having three, that is not the same

22   thing as Mr. Collins told me he then had three, but only showed

23   me one, that's a very different statement.

24             THE COURT:  I accept your quotation.  It changes my

25   analysis not at all.

1          *MR. KRAUT:*  Mr. Collins' position is that it should

2     change the Court's analysis, because that statement alone is

3     far too vague, even by the low preponderance of the evidence

4     standard to support a factual finding that Mr. Collins, in

5     fact, possessed and knowingly intended to control three

6     silencers, either on the date of the search, which was January

7     29th or two -- one to two months before New Year's Eve, which

8     was about three months before January 29th.  Had Mr. Wesley

9     said --

10          *THE COURT:*  Do I have any evidence that anybody else

11    lives there or is there two to three months before?  No.  Is

12    it -- does he live there, two to three months before?  Yes.

13          *MR. KRAUT:*  But there's no other evidence that there

14    were silencers there, two to three months before, and this

15    statement, itself, does not establish that there were silencers

16    there.  This is a statement, Mr. Collins talked about having

17    three; that statement could be Mr. Collins talked to Mr. Wesley

18    about having three silencers ten years ago.

19          *THE COURT:*  Yeah could be, and if they had not found

20    three, I would agree with you, but you are parsing this out and

21    saying, *Look at it in this narrow little tube*.  In terms of

22    drawing inferences from evidence; a couple of months before

23    agents found three.  He says I have three.  Those two things

24    aren't two separate things that are to be analyzed without

25    being aware of both of those things.  They both combine to

1    create something, in my mind, which is a preponderance.

2         MR. KRAUT:  And I am not asking the Court to separate

3    out these various pieces of information.  The first and most

4    important point of my argument is, he doesn't say *I have three*.

5    He talked about having three.  That phrase is not the same

6    thing as *I have three*.  The phrase, *I have three*, is a very

7    specific phrase that means something different than *talked*

8    *about having three*; and had Agent Schmitt's report included a

9    different quote from Mr. Wesley, I would not be making this

10   argument, but because all we have is the agent's report, which

11   I again don't believe to be fabricated, at all, I just think

12   it's not specific enough to support a preponderance finding in

13   terms of the language used and attributed to Mr. Collins.

14        What we do know, as the Court correctly points out, is

15   that two to three months later, after this purported

16   conversation, between Mr. Collins and Mr. Wesley, officers do

17   find three silencers in Mr. Collins' apartment.  However, it is

18   important that the silencers are found in two different

19   locations.  Two are in his yellow bike bags, that clearly had

20   an association with Calvin Collins, and one is on a shelf that

21   contains Ethan Collins' fingerprint.  The one on the shelf is

22   the one that he has pled guilty to, that we all agree that he

23   possessed.

24        The two in the bike bags, very easily, could have been

25   Calvin Collins' all along and Mr. Ethan Collins still could

1   have said, two to three months prior to Jacob Wesley, talked

2   about having three, in the sense of, I have one and my brother

3   may have two others.  You know, that could be talking about

4   having --

5          *THE COURT:*  In your head that could be an

6   interpretation, in my head it is not.  I mean, look, I take the

7   evidence, and I draw reasonable inferences from it.  You are

8   saying, he talked about having three, and I should come up with

9   every possible interpretation of that, other than the most

10  obvious one.

11         I talked about having a bottle of water.  Oh, doesn't

12  mean I had it, it means, oh, maybe, sometime, somewhere, my

13  judicial assistant had it or maybe... I don't know, Ms. Means

14  had it, and I could have got it from her.  You are asking me to

15  just do things that just is everything other than the simplest,

16  most obvious way of looking at things.

17         *MR. KRAUT:*  My dispute is that I'm asking, really, for

18  the government to be required to prove that this statement,

19  vague as it is, means what the Court believes it means, and the

20  Court is not requiring the government to so prove that.  The

21  Court is jumping to that conclusion without additional

22  evidence, and I understand the Court's stream of logic here,

23  but the evidence is not clear enough, on this point, and the --

24  it's our position that the government should be required to

25  present some additional evidence to clarify this point.

1          THE COURT:  And so, just to take it out to the absurd,

2     if the statement were Mr. Collins talked about having a dead

3     body in his basement, and later on they find a dead body in his

4     basement, I shouldn't draw any inference that Mr. Collins,

5     somehow, was associated with that dead body or killed him or do

6     anything else.  I should just make all of these interpretations

7     of what, having talked about having means, other than the

8     obvious one, which is, it means he was saying he had; because

9     he talked about having a ballistic vest, and he did; he talked

10    about having chest plates, and he did; and he talked about have

11    three silencers, and he did.

12         Why am I requiring them to go do anything more, when

13    what is presented to me, from my perspective, leads to only one

14    reasonable conclusion?

15         MR. KRAUT:  First of all, I don't believe that the

16    report quotes Mr. Wesley saying Mr. Collins talked about having

17    ballistic vests and chest plates.  Mr. Wesley reports seeing

18    one silencer and then the -- the ballistic vest --

19         THE COURT:  All right.  Well let's stop fooling

20    around.  You have the report, give it to me, I will look at it.

21    Ms. Pearson, go get it, and then I will know exactly what it

22    says.

23         MR. KRAUT:  Um ... I can find it.  The other issue I

24    wanted to raise is that the legal question -- so let's use the

25    Court's example of the dead body.

1          THE COURT:  All right.

2          MR. KRAUT:  The -- the Court -- the language the Court

3     used in phrasing that example was, should I believe he is not

4     associated with it?  No.  That makes perfect sense.  If someone

5     is going to say -- if someone is going to talk about having a

6     dead body in their basement, and then you find, three months

7     later, a dead body in the basement; sure there's an

8     association; absolutely, I give you that.  My question for the

9     Court is --

10         THE COURT:  And I give you that I stepped in it, and

11    you can go ahead and point it out to me in extensive detail.

12    Go ahead.

13         MR. KRAUT:  The legal question is not about

14    association.  It's about power to control and intent to

15    control, and that's what the law on constructive possession is

16    critical here.  So, this statement is not enough to establish

17    power and intent to control --

18         THE COURT:  If there were anyone else living there,

19    being there, I would agree with you, but the person that you

20    want me to put it on, Calvin, he is not there.

21            MR. KRAUT:  He is there when they find the silencers.

22            THE COURT:  True.  But he is not there before that.

23         MR. KRAUT:  But they don't find the silencers before

24    that.  We just have this -- this amorphous statement, and then

25    when they actually find the silencers, we have Calvin there,

1    Calvin's luggage there?  These very unique bike bags there.

2    The silencers found there.  No finger fingerprints or DNA --

3              THE COURT:  None of which you need for proof beyond a

4    reasonable doubt, much less for proof by a preponderance.

5              MR. KRAUT:  Correct.  However, all of those factors,

6    viewed together, undercut the evidentiary value or the impact

7    of this vague statement by Mr. Wesley.

8              Had Mr. Wesley -- had another witness seen the actual

9    silencers, even Mr. Wesley, had Mr. Wesley seen the other two

10   silencers, at the time, I would not be making this argument.

11   There's a million other ways that this could be corroborated

12   and it's not, and as it stands, our position is, it's just not

13   enough for a preponderance.

14             THE COURT:  And I agree with you that it could be the

15   case that I could conclude that the evidence is insufficient,

16   and if I were to conclude that the evidence is insufficient, it

17   would be wrong of me to say, *Well, it's all that I have got*,

18   and make a decision based on that.  I agree with that.

19             I also agree that if it's insufficient, that falls on

20   the government as their failure, and in short, you win.  The

21   problem I have is, I don't see it as being insufficient.

22             MR. KRAUT:  Right.

23             THE COURT:  And given what I have got, I recognize the

24   coulda, woulda, shoulda, maybe this might be the other thing,

25   explanations of what Mr.-- what Mr. Wesley's statement may have

1    meant, but I have got Wesley's statement, when Calvin is not

2    there.  I have got accurate references being established by

3    what they find when they do the search.  I have got Calvin

4    saying something that you don't even think is right, which is

5    *all of them were mine*, and I have got your client saying*, I*

6    *made two of them.*

7            I cannot pile that together, in any scenario, and come

8    to a conclusion that the government is -- has failed in its

9    burden to establish, by a preponderance, that Ethan Collins did

10   not possess -- I'm sorry -- failed in his burden to show that

11   Ethan Collins did possess three silencers, and I appreciate

12   what you are saying, I just view it very, very differently,

13   than you.

14           MR. KRAUT:  And so then, for my last argument on this,

15   what I would focus on is our different views of whether this

16   evidence is sufficient or not.  Mine is informed, in large

17   part, by the three cases that we compared this to, in the

18   Presentence Report objections which are Zamora, Simpson and

19   Bedford, and as noted in the footnote in the Presentence Report

20   objections, it was a different legal standard that was being

21   assessed there; this was not a preponderance of evidence at

22   sentencing.  None of these cases --

23           THE COURT:  Right.

24           MR. KRAUT:  However Zamaro we have got DNA and

25   exclusive control over a car, and that still gets reversed for

1     obstructional error.  Simpson, we have the defendant -- a

2     witness sees the defendant holding it, a confidential

3     informant, and then the detective reports the defendant

4     admitted to holding it, and the gun is found in the house,

5     which he shared with his wife.  And then Bedford we have got a

6     gun on a bedroom floor shared by the defendant and his wife,

7     and statements months and weeks before by the defendant,

8     suggesting knowledge and intent to control guns.

9           All three of those cases, to me, map out something of

10    a threshold, for constructive possession in these gun cases,

11    where the defendant is not found holding it.

12          I don't think the Collins' factors, as the Court has

13    identified them, even giving the Court the inference that the

14    Court wants to draw from Mr. Wesley's statement, even that

15    doesn't rise to that threshold.  That's --

16          THE COURT:  Look, I get that, but I mean, again, you

17    are trying to push me into a little corner where the sign above

18    me says constructive possession.  What I'm trying to tell you

19    is, where somebody admits making silencers, and there is reason

20    to believe that someone has talked about having silencers

21    before there is anyone else living with him or anyone else

22    staying with him or anyone else in that apartment, and the

23    alternative suggestion that's being pushed on me, is one that

24    you don't even believe; that is, that all of the silencers were

25    Calvin's, that somehow I should get in there, start picking up

1    concepts like constructive possession.  I don't need to.

2          The way I'm looking at it, he had actual possession,

3    because he is speaking about having them before anybody, and

4    the anybody in this case being law enforcement, finds them.

5    When he is interviewed, he talks about exercising control over

6    them, in the sense of, *Well, I didn't intend to mess around*

7    *with them*.  Clearly, indicating the ability to control.  He

8    talks about, *Yeah, I made the two, or two*; clearly indicating

9    that he had to have control, and you want me to -- to get --

10   climb in Calvin's yellow bag, and start rooting around in there

11   and making some inference that I don't need to make.

12         The way this presents, it is, by a preponderance,

13   clear to me that he had actual possession and constructive

14   possession, and while you are right, there's always something

15   more that could be done, and I suppose I could sit and demand

16   that the government, I don't know, bring in Wesley or somebody

17   else.  I don't see a need to do it, because I don't think this

18   evidence is close.  It's not like, it could go either way.  I

19   can't see any other way of making it make sense, other than to

20   engage in some strange and strained interpretation of what,

21   really, one means when one talks about having it months before

22   Calvin arrives.  I can't do it.

23         *MR. KRAUT:*  I understand.

24         *THE COURT:*  All right.

25         *MR. KRAUT:*  Thank you.

1          THE COURT:  What is it that you now want to add?

2          MS. SURRATT:  Your Honor, I anticipated correctly,

3    that the attack would be on the reliance on Mr. Wesley's

4    statements.

5          I will say two things, and I will be brief, because I

6    do agree with the Court's analysis.  The first thing I will

7    say, just for clarity and candor, we do believe there was a

8    roommate, at some point, living in the second bedroom, that was

9    empty when Calvin was there.  I don't know the precise

10   timeline, but at some point Mr. Collins did have a roommate.

11   Obviously, Mr. Collins knows that, and I assume that Mr. Kraut

12   knows that, but I just wanted to be totally transparent with

13   the Court.

14         As the Court knows, I did not rely on Mr. Wesley's

15   statements in my argument for why the enhancement should apply,

16   because I do think the Court can get there without Mr. Wesley.

17   I think that it is a similar -- I think it is a similar hole to

18   dig out of, when you take into account the fact that the

19   defendant told Special Agent Schmidt that he made two of the

20   silencers.  I recall how we get there.  At that point, during

21   the search, the agents had only found two silencers, and it's

22   the government's position that it doesn't matter which two,

23   right, because at least one of the two that they found was in

24   the yellow bags, because the only other silencer was on the

25   bookshelf.  There's been no argument to try to parse out one

1  silencer in the yellow bag versus the other silencer in the

2  yellow bag.  So, the government's position is, Mr. Collins,

3  without knowing which two silencers, Special Agent Schmitt was

4  referencing, admitted to making them, and it takes, again, the

5  argument to absurd lengths to say that, *Well, he made two of*

6  *them, but the other one in the yellow bag was Calvin's and*

7  *wasn't Mr. Collins', even though both yellow bags were in his*

8  *bedroom in a pile of his stuff.*  So, that's how I get there,

9  without relying on Mr. Wesley, and I do think that the Court's

10  argument is cleaner and simpler, but I did -- I do think that

11  the Court can get to the same place, without relying on

12  Mr. Wesley, just based on Mr. Collins' own words.

13       *THE COURT:*  Well, I mean, I don't need to -- I don't

14  need to go there, because, to me, I'm looking at the collective

15  body of evidence, and it all points in one direction.  I mean,

16  Wesley, no Wesley, it points in the direction of ... Mr. Ethan

17  Collins having possession, actual, constructive, frankly, both;

18  and it is particularly difficult to come up with some other

19  explanation, when the other explanation is one that Mr. Collins

20  builds and it's based on nothing.

21       Calvin Collins does not say, I had two and Ethan had

22  one.  I have got to impeach, if you would, Calvin Collins, and

23  then find something he never even said.  The whole thing is

24  just ... picking at nits, that don't need to be picked.  It

25  really is not that complicated.  The objections are overruled.

1          What that means is ... as I said, the Total Offense

2     Level is 17.  The defendant's Criminal History Category is I,

3     which results in a guideline imprisonment range of 24 to 30

4     months; fine range of $10,000, to some amount that I have not

5     been told, but it doesn't matter, because I'm not going to

6     impose a fine, anyway.

7          *PROBATION:*  It's statutory --

8          *THE COURT:*  It's a flat 10,000?

9          *PROBATION:*  Yes.

10         *THE COURT:*  Fine range of $10,000 and a supervised

11    release range of one to three years, and I forget that we're in

12    Title 26, as opposed to Title 18, that's why Ms. Means is here.

13         Anyway, she is also showing off for family, but that's

14    a whole other matter.

15         Look, here is where we are; what do we do now with the

16    sentencing?  The guideline range is 24 to 30 months.  I have

17    got the government saying, *Give him the top of the range*; I

18    have got the defendant saying, *Give him probation.*  I also know

19    what probation's position is.

20         I will hear from each of you.  I will tell you this,

21    you all -- each side has points to make in this, and I don't

22    know that this -- well, I know that it is unnecessary to say

23    this.  I'm going to say it any way.  Mr. Kraut, you might --

24    and I am not saying that you do -- you might have some concern

25    that I might be, I don't know, thinking of this defendant in a

1   similar manner that I thought of another defendant that you

2   have had.  I'm not.  So... I don't think Ms. Surratt has a clue

3   what we're talking about.  I can give you a name, and it isn't

4   going to help you any.  Holzer.

5           MS. SURRATT:  I know the case, Your Honor.

6           THE COURT:  I'm not.  I'm looking at this one on its

7   own, and frankly, I think he and Mr. Holzer are different

8   people.

9           What that means, well, that's not anything that I have

10  revealed yet, but let me take argument.  And I suppose I'm

11  going to give you, each, more than one opportunity to come at

12  this.  So, let me start with you, Mr. Kraut, please.

13          MR. KRAUT:  Thank you very much, Your Honor.  We're

14  asking the Court to vary downward to a probation sentence.  I

15  suppose as an alternative, the Court could impose a time-served

16  sentence followed by supervised release.  We recommended

17  probation.  We are seeking probation, because it comes with a

18  heavier consequence, should he violate -- heavier potential

19  consequence should he violate.

20          Either such sentence would reflect the more than

21  one-year Mr. Collins has already spent in custody in this case.

22  So, we believe that that period of imprisonment is, itself,

23  sufficient to satisfy the needs and the goals of the sentencing

24  statute.

25          The time that he has already served has made an

1  enormous difference in Mr. Collins' life, and I think the Court

2  will hear from him today, and be able to hear for itself, how

3  much this year -- year-plus in confinement has meant to

4  Mr. Collins.

5          First, some basic facts that are, I believe,

6  undisputed.  The South Carolina, United States Probation Office

7  has approved -- visited and approved Mr. Collins' home as a

8  residence for him, if released to probation.  The intent of

9  Mr. Collins would be to move back in with his parents as

10  quickly as possible.  In preparation for this, his parents have

11  gone to, in my view, tremendous lengths to obtain job

12  opportunities and counseling opportunities for him, near their

13  home.

14          One of the counseling opportunities in particular,

15  Dr. Becky Boatwright spoke to me about this case, at length,

16  with Mr. Collins' permission I gave her a great deal of detail

17  about what happened her, even shared with her Dr. Huckabee's

18  report that she reviewed.  After viewing all of that material,

19  she came back to me and said, *Yes, I can work with this person.*

20  *I think I can help him*.

21          THE COURT:  Look, let me just say a couple of things.

22  Number one, I do not minimize, trivialize or make light of the

23  efforts that parents have made to pave the road, so to speak;

24  that being said, if probation does anything by way of

25  mental-health treatment, things of that nature, I want them

```
 1    making their own decisions and putting to the side any efforts

 2    that family have made.

 3            I don't mean to suggest that anyone is trying to pull

 4    anything.  What I do mean to suggest is that the probation

 5    department has people that it works with, and they are going to

 6    go through their normal processes, rather than taking

 7    suggestions from the parents, and just to highlight something

 8    that you may already know is my view by now, just on simple

 9    levels, Dr. Boatwright is being called -- presented to me as a

10    psychologist.  She's not.

11            MR. KRAUT:  I think she has a Ph.D.

12            THE COURT:  She is not.  She is Dr. Boatwright,

13    because she has a doctorate in philosophy.  Whoopee.  She is a

14    counselor.  She is a licensed counselor; that's fine.  I mean,

15    if you look at the alphabet salad behind her name, you don't

16    see PsyD.

17            MR. KRAUT:  Ph.D.

18            THE COURT:  Yeah, in philosophy.

19            MR. KRAUT:  Well, a doc -- isn't every psychologist a

20    Ph.D?

21            THE COURT:  She is not a psychologist with a Ph.D.

22    She is a counselor.

23            MR. KRAUT:  Oh, I'm sorry, Your Honor --

24            THE COURT:  Again --

25            THE COURT:  I'm not trying to pick at you over that.
```

1          MR. KRAUT:  Sure.

2          THE COURT:  All that I'm saying to you, sometimes

3     these efforts generate beliefs and characterizations that I

4     don't want probation relying on.  Probation is there to do its

5     work.  I appreciate and acknowledge the efforts that the family

6     has made to -- to, as I said, smooth the road, but the notion

7     that I would either impose time served or probation, and then

8     say, *Yeah, let's do what the parents have said and lined up for*

9     *him;* I'm not doing that.

10          MR. KRAUT:  Sure.  And for -- in part, because of

11    that, I haven't, you know, objected to the proposed supervised

12    release conditions and asked to replace them with

13    Dr. Boatwright; that's not our position.  I agree with

14    everything that the Court is saying.  We need to defer to

15    probation in whatever jurisdiction he lands.

16          THE COURT:  Right.

17          MR. KRAUT:  Whether it's called supervised release or

18    probation, he is going to be under some community supervision,

19    and it's important to let those professionals determine the

20    details; totally agree.

21          The point, I think, that can be taken, from this

22    aspect of our variance argument, is that this high level of

23    involvement by his parents, whether it produces actual changes

24    in his supervision or not, it reflects a degree of concern and

25    care and pro-social --

1          *THE COURT:*  No question.

2          *MR. KRAUT:*  -- parenting, that many defendants don't

3     have and, I think, overall reduces Mr. Collins' --

4          *THE COURT:*  I don't know whether it's them or him, but

5     it even found its way into your motion, because I do not

6     believe, for one nanosecond, that an individual from the

7     Federal Public Defender's Office, in Colorado, and an

8     individual who, prior to that, was the State Public Defender's

9     Office in Colorado, decides to convince me of the need for

10    variance by quoting a Utah District Court Judge, current

11    Senator Lee and Former Senator Hatch.  I find that to be beyond

12    coincidental.

13         *MR. KRAUT:*  That article actually ... where is it?

14         *THE COURT:*  <u>Deseret News</u>.  It's a little tone-deaf in

15    my understanding, what the <u>Deseret</u> refers to, and I could be

16    completely wrong on this, is a period of time, in our history

17    where people tried to or believed that they established their

18    own separate state, which was wider than Utah, and they wanted

19    to recognize it.  Of course, the irony and tone deafness of it

20    is, isn't that kind of what we're, kind of, talking about here?

21    The whole thing makes me smile.  It doesn't make me hold

22    anything -- any kind of animosity towards Mr. Collins, but I

23    don't -- I can't not see the irony of it all.

24         *MR. KRAUT:*  I admit that I did not do a great deal of

25    research on the origin of the word *Deseret*, but now that you

1   mention it, I think that's correct; that quote, in that
2   article, I think is important to note, in general, and actually
3   I did add that, that wasn't Mr. Collins' suggestion nor his
4   parents' suggestion, although certainly coincidental.
5           THE COURT:  Whatever.
6           MR. KRAUT:  The point is that --
7           THE COURT:  It's not wrong.  I mean, that's the point.
8   It's not wrong.
9           MR. KRAUT:  Right.
10          THE COURT:  And, ultimately, the other point is
11  whether it's them, you or anybody else, I acknowledge their
12  involvement.  I acknowledge their care.  I acknowledge their
13  wanting to help and protect their son.  I -- I acknowledge all
14  of that.
15          MR. KRAUT:  And that's excellent to hear, and I think,
16  in addition to all of those, they also demonstrated, over this
17  last year, not just their desire to help their son, but an
18  ability to actually help him in meaningful ways, whether that
19  turns into his detailed conditions or not, is beside the point.
20  They can and will help him stay safe in the community, and I
21  know the Court is procedural -- government is primarily
22  concerned about community safety here, and so this extra layer
23  of unique parental involvement, in our view, reduces the public
24  safety risk of a probation sentence.
25          So, that's why I wanted to mention that the same can

1    be said of the job opportunities that they have gathered for

2    him.  Of the job -- many job opportunities that have been

3    offered to Mr. Collins, the one that has resonated with him,

4    and he really wants to pursue, is becoming an electrician,

5    which I found to be interesting, when I spoke to him about it,

6    for several reasons.  The main one is I have never been a pilot

7    or an electrician, so I guess I'm talking out of turn here, but

8    my understanding of both fields --

9            THE COURT:  Or a psychologist.

10           MR. KRAUT:  Or a psychologist.  Well, I talked to more

11   psychologists than pilots and electricians.

12           THE COURT:  Fair enough.

13           MR. KRAUT:  My understanding is that both jobs are

14   very, sort of, checklist oriented, and you can't miss a step or

15   else something is going to blow up or a plane is going to

16   crack, and Mr. Collins, interestingly, to me, has gravitated

17   towards becoming an electrician, and I think it would suit him

18   very well.  He -- the way his mind works, his work ethic, I

19   think he would be an excellent electrician.  He is very primed

20   to follow checklists, take direction, make sure he doesn't miss

21   a single step; that's what he did as a successful pilot and

22   that's what he can do, and I commend him for thinking about the

23   next step in his life.

24           I will tell the Court, it has taken Mr. Collins a good

25   amount of time to accept the reality, that his career as a

1    pilot is likely over; almost certainly over.  It's been very,

2    very hard for him, emotionally, but eventually I think enough

3    months went by that he began to accept that reality on an

4    emotional level.  He transitioned into thinking about what he

5    can do next, and then with his parents' help and the help of

6    the community there in South Carolina, he has landed on this

7    plan, this hope, that I think is realistic and obtainable and

8    can put him in a position to really succeed, long term.

9         Again, another factor, here, that will reduce the

10   public safety risk of a non-incarceration sentence.

11        We're also asking for part of his sentence to include

12   a significant component of community service.  I suspect that

13   this is not overly compelling to the Court --

14        *THE COURT:*  It's not, but I understand it.  To the

15   extent that you are asking for probation, I'm aware of the

16   statutory requirements, that check boxes, that should be

17   certain things, and so you check one of those boxes by saying,

18   hundred hours of community service; and you are correct in your

19   read of me, I don't see that as being a make-or-break issue for

20   this man.

21        *MR. KRAUT:*  No, it's not.  But in addition to making

22   sure that the statutes are satisfied with the probation

23   sentence, philosophically I do think that it's important that

24   Mr. Collins do something to restore what he did; to try to make

25   things whole again; try to make things better for some

1    community.

2         He -- although the community wasn't aware of what he

3    was doing, his research and his actions and his words were

4    frightening and give the government and the Court a great deal

5    of concern, and I think by demonstrating his willingness and

6    actual desire to serve the community again, he is showing his

7    remorse is genuine, he is showing that he understands what he

8    did was wrong and he wants to try to make it right.

9         As the Court mentioned earlier, he doesn't have the

10   money, right now, to pay a fine, should he be fined, but this

11   is one way he can try to make things whole again.

12        *THE COURT:*  All right.

13        *MR. KRAUT:*  The other aspect of a probation sentence,

14   that I think is so important here, and the Court needs to

15   consider, in our variance request, is the need for mental

16   health and emotional regulation help.  This is an individual

17   who has a very unique set of circumstances related to his

18   mental health and emotional regulation.  They were never

19   identified in the way they have been now.

20        This case, in particular, Dr. Huckabee's evaluation,

21   has opened Mr. Collins' eyes to a lot about himself, and about

22   his future that he never understood.  Didn't understand when he

23   was committing the crime; he didn't understand when he was

24   researching government overreach, if that's what we want to

25   call it; and he certainly didn't understand for all of the

1   years that he was growing up, neither did his family.

2          Now --

3          THE COURT:  Although his sister did suspect it, didn't

4   she?

5          MR. KRAUT:  And, you know, because the sister

6   suspected it was a big piece of what started me down that path,

7   and that's often what happens in these cases.  We have a family

8   member or close friend say, I always sort of wondered... and

9   then you dig into it turns out yeah --

10          THE COURT:  My comment was two fold.  Number one --

11   was meant to be two fold.  Number one, was to acknowledge that

12   his sister, I'm not saying that she had a solid belief, but she

13   had suspicions, and she communicated them, and the other was to

14   to communicate to you and everyone else what is obvious to you,

15   by my making that statement, that is, that I have looked at

16   everything going back to day one, from the bond report, every

17   piece of paper in this case coming forward, because I think

18   that's the only place that there's a reference to his sister --

19          MR. KRAUT:  That's correct.

20          THE COURT:  -- saying that.

21          MR. KRAUT:  That's right, in the pretrial report.

22          THE COURT:  Out of Utah.  Yeah.

23          MR. KRAUT:  Further incarceration is unhelpful to

24   Mr. Collins' mental health, and it does not serve the statutory

25   function of getting him the treatment that he needs in the most

1    effective manner.  The treatment he needs is very specific.

2    This is not -- he doesn't need to be in a substance-abuse class

3    that the bureau of prisons can offer.  He doesn't need to be in

4    sort of an anger-management class that the bureau of prison can

5    offer.  This is a very different and unique defendant, who

6    needs the type of treatment that Dr. Huckabee has identified,

7    and I believe that even differing to a probation office in

8    South Carolina or here or anywhere, that type of treatment can

9    be provided to him out in the community.  The probation --

10   United States Probation Office has certainly worked with

11   typical treatment providers for many cases, but they are not

12   prohibited from engaging with someone who has a better

13   specialty in a certain area.  So, they can and I believe will,

14   in this case, get him the treatment that he needs in an

15   effective manner in the community, whether they rely on the

16   parents for direction on that is up to them, but I think it

17   will happen for him in a way that it will not in prison, and he

18   needs it, and it will help keep him safe.  It will help keep

19   the community safe, as well.

20           Mr. Collins has a great deal of remorse for what he

21   did, and the government, I -- in reading -- trying to read a

22   little bit between the lines, I think the government may have

23   some concern that he is not actually remorseful, that he is, I

24   don't know... remorseful that he got caught or regrets that he

25   got caught.

1      *THE COURT:* Let me say it a little better.  If you

2   look at all of the places where you can see statements that can

3   be firmly rooted in Mr. Ethan Collins, as opposed to the

4   statements that you make on his behalf, you seem more adamant

5   about his remorse than he does.  He says things like, *I should*

6   *not have taken that silencer; that gift*.  He says -- he

7   talks -- and I understand that's the charge.  He -- *I hung*

8   *around the wrong people... Internet sites*.  There's a

9   suggestion that much of this other stuff is due to anything

10  other than him.  It's due to severe isolation during COVID,

11  when he and I both know that there was isolation, but he went

12  up to see his sister in Utah a couple times.  His parents came

13  to see him at least once.  The picture that you submitted,

14  obviously, shows that, because they are standing in front of

15  Boutique Air, and Mrs. Collins has one of those blue surgical

16  masks, in her hand, which obviously puts it in the timeframe of

17  COVID.

18      His brother was in contact with him, multiple times,

19  according to the brother; although, again, everything that the

20  brother says I take with a grain of salt, because I don't have

21  the exact quote in front of me, but that when he was speaking

22  to the FBI he said something along the lines of, *He tried to*

23  *redirect him several times*, which means that there's

24  communication and contacts going on.

25      So, I don't mean to be driving -- I made a left turn

1    here, on the logic road, so to speak, but I think that what

2    they're saying is, he is sorry about the silencer and has

3    excuses for the other stuff, and that's the way it looks to

4    them.  Frankly, it looks that way to me too.

5            MR. KRAUT:  Well, I'm glad we've landed on this issue,

6    because it is very important for Mr. Collins, I think, to

7    clarify this, and you will hear from him directly, today, and

8    I -- I have heard what he plans to say to the Court, and it's

9    my view it's genuine and it does include remorse for all of the

10   other stuff, as well.  He now, the time in jail, has changed

11   his perspective; that's the quick answer.

12           The more subtle and I think more accurate way to view

13   this aspect of the case, is that there's a fine line that I

14   need to walk, and I think the Court needs to understand,

15   because it is true, on the one hand, that Mr. Collins is more

16   easily influenced than a non-autistic person.  Dr. Huckabee's

17   report discusses that.  It is also true that the Google

18   searches he did and the materials that he wrote were not done

19   under duress.  No one forced him to do that.  Those were his

20   choices, and he takes responsibility for those choices, even

21   though they didn't result in a criminal conviction and never

22   would.

23           He is the type of person who, for better or worse,

24   will fall into or engage in very deep research and thinking

25   about a particular topic, sometimes to his own detriment, and

1    that is what happened here.  We're not trying to blame others,

2    blame the Internet, on the thoughts that he had or the things

3    that he wrote.  What I'm trying to do is make sure the Court

4    understands that the extensive writings, and the extensive

5    research that he engaged in are, in part, reflective of the

6    unique personality structure.

7         THE COURT:  All right.  You know, by now, that I tend

8    to be two things; one is, talky; and two is, transparent, or at

9    least I try to be transparent.  I will tell you, without trying

10   to find the most delicate phraseology, that when you see notes

11   and pads and tablets and things like this, one's mind jumps to

12   the kinds of things that crazy people do; manifestos and things

13   of that nature, and there is an inference that comes off of the

14   extensive note taking.

15        I won't go so far as to say whether I did or did not

16   draw such an inference earlier in the case.  What I can say is

17   that I now understand that the volume of note taking, the

18   desire, if you would, to note take, probably does flow from

19   autism; that's a different topic than the content, and it's a

20   different topic than what is he doing; but, certainly to the

21   extent that I'm being -- trying to be transparent with you, I

22   don't take these extensive notepads as... you know, the

23   equivalent of.... pick your guy, you know, the --

24        MR. KRAUT:  Yeah.

25        THE COURT:  -- the guy that lived in Montana, in the

1    woods.  Whatever.  I view them as different; at least in the

2    motivation for the note taking; whatever that means.

3         MR. KRAUT:  And it's helpful to know.  The next

4    question then becomes, what do we draw -- what inference do we

5    draw from the content?  And that's the more concerning

6    question.

7         Mr. Collins is not, for a minute, today, or through

8    himself or through me going to try to justify or minimize the

9    nature of that contact.  He knows that what he was diving into

10   was dangerous, and he now knows that it was both inaccurate,

11   inaccurately -- rooted in an inaccurate understanding of the

12   government, which is important for him to recognize.  All of

13   this is all argued in the pleadings and I think at the bail

14   hearing, came from a sense of fear, by Mr. Collins, that the

15   government was going to harm its citizens.

16        He now understands that that fear, in him, though

17   genuine at the time, was rooted in inaccurate understandings

18   about how the government functions and what was going on during

19   the COVID pandemic.

20        THE COURT:  I'm not going to get into it now, because

21   I said I would give you a second shot.  I will tell you, now, I

22   think that's a little simplistic.

23        MR. KRAUT:  I'm sure it is -- what he was doing and

24   what he was thinking about, I'm sure had more nuance than that,

25   but that's my view of what was driving him then, and what I

1    want the Court to understand that is that he now recognizes,

2    after this year-plus in jail, that he does not need to be

3    afraid that the government is going to attack its citizens or

4    harm its citizens or use the COVID pandemic to attack or harm

5    its citizens.  Those fears are no longer driving his thoughts

6    and behaviors, with respect to the government, in the way that

7    they once were, and so it's not -- we're not here to say, you

8    know, everything he thought then was justified.  He just

9    doesn't think it any more.  It's that he really has evolved to

10   recognize that he should not have adopted that perspective to

11   the degree that he did.

12        Now, why was he primed to accept those fears or adopt

13   that particular perspective?  We could go on for days about his

14   background or his autism or the influences that he encountered

15   on the Internet or his brother; any millions of factors.  I

16   don't think it really matters --

17        *THE COURT:*  Oh, it matters.  How can it not matter?  I

18   mean, on the one hand -- look, let me be clear.  I don't doubt

19   that, if you would, the flame grew during this period of time.

20   But I also don't doubt that there was a flame before this, and

21   these are two separate scenarios; one, somebody is, kind of,

22   going along, having no issues, having no concerns, having no

23   anything, but just, kind of, gets caught up in COVID and, you

24   know, what the 2020/2021 was, and somebody who really does

25   believe that the government is... concerning.

1          To be clear, you can have thoughts and beliefs, I
2  don't, frankly, care.  I'm not trying to be the mind police.
3  I'm not trying to weigh or put a grade on somebody's belief or
4  criticize them for not trusting the government or things like
5  that.  But when you talk about accepting the message, these are
6  two very different people that I, theoretically, created
7  because, for the one, the one where it's, you know, just sort
8  of the 2021 calendar year's absurdity that led us to this
9  point, it's easier to say, yeah, this -- this is an aberration
10  and it won't happen again.  For somebody else, who is primed to
11  look at the government in a certain way, it's a little more
12  concerning, because who knows.  We have another, pick it, a
13  pandemic, another variant, another election cycle where people
14  think that hate and separation is the way to get elected, and
15  you can fill in any number of things that you want behind that,
16  that second class of person I have more concern about, not
17  because of their beliefs, but because they are primed and ready
18  to say, *Oh, see, look at that*; and if, in fact, the *Oh, see,*
19  *look at that* justifies the response in his mind, and I am sure
20  it still does, and we could even have an intellectual argument
21  if the government were attacking its citizenry, wouldn't it be
22  proper for those citizens to respond in kind?  We could have
23  that debate.  I'm concerned about that second class of person
24  deciding, on his or her own, *Oh, there's that bad government*
25  *again*.

1        MR. KRAUT:  Here is what -- I'm sorry, Your Honor.

2        THE COURT:  No, I'm done -- well, I'm not done, but

3   that's round-one done.

4        MR. KRAUT:  I think the -- here is my understanding of

5   what -- to use the Court's term, the preexisting flame that was

6   within Mr. Collins, here is what I think was there, that got

7   fanned, to continue with the analogy.

8        I think that Mr. Collins was raised with, essentially,

9   mainstream, faith-based conservative values.

10       THE COURT:  And that's where you and I disagree.  The

11   word mainstream.

12       MR. KRAUT:  Well -- okay.

13       THE COURT:  Let me explain what I mean.  I told you, I

14   put it out to each of you, that I went and looked at family

15   Facebook pages, because I don't want to be trying to do things

16   that you don't know I'm doing.  I'm not saying any of these

17   beliefs are wrong, and I am not saying any of these beliefs

18   suggest some negativity about Mr. Collins, but they are not

19   mainstream.

20       His sister has posted that there's an international

21   health police force that is trying to become rooted in the

22   United States, and that we should be aware of it and vote

23   against certain things, so that that international police

24   force, on health matters, doesn't come in.

25       She has also posted that public school -- public

1    education is -- was originally designed to create government

2    workers, obedient citizens, as opposed to education.

3            There are other things, taking kale keeps COVID away,

4    and that's because, again, her father has -- is a chiropractor,

5    has some video that he has posted about COVID.  He is entitled

6    to his view.  I'm not trying to do anything other than say it's

7    not really mainstream.

8            We don't even really want to talk about Calvin,

9    because that's just putting something on a tee ball and

10   whacking the hell out of it.  He calls himself an anarchist.

11   He is a smartass when he talking to the FBI.  He believes

12   that -- because he has got some collective knowledge about

13   various little trivia facts, that he is smarter than everybody

14   else, and he really, really believes it, but he also believes,

15   much of this anarchy stuff.

16           Fascinatingly, the Presentence Report shows that his

17   family has suggested that he have limited contact with Calvin.

18   I believe his mother has reflected in the Presentence Report,

19   as saying that Calvin comes around the house on a limited

20   basis, but Ethan now knows who to listen to and who not to.

21           And when Calvin was with his mother in New York, the

22   posting was, *Well, they went into Trump Tower*, so that she

23   could get, I believe it was, a hot chocolate at Starbucks, that

24   was inside, but Calvin went right around and came back out, and

25   that's being posted as an affirmative kind of my -- my

1    wild-child son, you know, look at this, it's humorous, because

2    he is there to protect his mom.  The reason he came back out is

3    because he was armed, he says, with a pistol, and tone-deaf is,

4    you know, he has got to carry a pistol in New York City.  You

5    and I both know, the only reason I know is because Plaxico

6    Buress, that carrying a handgun in New York City is a felony,

7    with a mandatory minimum, and posting it up there, as if it's

8    some positive thing.

9            There's a lot of things that are out there, that I

10   would not call mainstream, and again, I'm not criticizing or

11   saying people have to believe the same thing or that they --

12   their beliefs are somehow bad or different, but I am saying

13   that this general concern about government, that's not

14   something that popped up when COVID did.

15           MR. KRAUT:  Right.

16           THE COURT:  It's been there; that's the flame I'm

17   talking about.

18           MR. KRAUT:  Okay.  And I understand, and to keep the

19   focus on Mr. Collins and what was in his mind before COVID and

20   how COVID affected it, my point about his background is that it

21   appears to me that, throughout his homeschooling and his

22   childhood adolescent years, and even throughout his mission

23   years, in the United Kingdom, he was raised and encouraged to

24   believe in small government; in that, the government really

25   should not be -- should not be controlling the -- the free

1   choices of the citizens, in a general sense, and that is what I

2   was referring to, as a relatively mainstream, conservative

3   viewpoint.  Okay.

4            All of the details about the most recent postings and

5   those sorts of things, I don't know and I don't think the Court

6   does either, to what extent those types of views were placed in

7   Mr. Collins' head as a child.  I don't think that's --

8            THE COURT:  I'm not drawing that inference.  I'm just

9   saying that, you know, look, one's upbringing does -- as you

10  tell me frequently --

11           MR. KRAUT:  Absolutely.

12           THE COURT:  -- one's upbringing does impact what one

13  becomes.

14           MR. KRAUT:  That's right.  And the pieces of --

15           THE COURT:  And that's all that I'm saying.  That

16  there is a distrust of government that is not tied to COVID.

17  It is deep.  And it -- based on what I see, I'm not saying that

18  the family shares this, you know, blow up -- they don't.  I

19  don't want to go that far, and I don't want to be misunderstood

20  that way, and I know how awful it is to be sitting in the back

21  of the courtroom and thinking I'm blaming this on them.  They

22  have nothing to do with this offense, in terms of its

23  commission.

24           All that I'm saying is that you can teach your

25  children certain things, or they can come up and believe

1    certain things and then take it to dangerous places, and that's

2    what I believe happened with Mr. Collins.  But the ability to

3    take it to dangerous places still exists; that's my concern.

4         *MR. KRAUT:*  Understood.  And I think what they raised

5    him with, and what he had before this offense was a genuine

6    belief that was rooted in their faith, and that included

7    feelings that were very pro Constitution, but also very anti

8    big government, and I think that those beliefs are safe for

9    Mr. Collins to continue to have, as long as they remain as they

10   were while he was raised.  I think he got off track from what

11   his family taught him, and the values he was raised with, I

12   think it's important to talk about the value that he was raised

13   with, to look beyond just a political viewpoint or social

14   viewpoint, and also reflect on the fact that he was raised to

15   believe in service to others, as a critical component of life;

16   especially, from their faith, this is why he did his service

17   project in the UK.  It's also a big part of why he wanted to

18   become a pilot, because he views it as, essentially, a civil

19   service career, which it is.  You know, pilots are -- I don't

20   know how well they are compensated, but he certainly wasn't

21   making a ton of money.  He was doing it because it was

22   interesting to him, he was good at it, and because he thought

23   it was a good service to provide to the world, to the

24   community.

25              Service projects were a regular part of his

1    upbringing.  He was an Eagle Scout.  He did service projects

2    through the church, routinely, all the way up to modern day.

3    If released to his parents, service projects, through their

4    church in South Carolina, would be a regular part of his life.

5    I have every confidence that that is true.  I think the Court

6    does, as well.

7            His upbringing, yes, included some views about the

8    United States Government that, I do think, to some extent,

9    primed him for the thinking that, ultimately, got him into

10   trouble, but he wasn't taught to believe that the government is

11   going to attack the citizenry.  He wasn't taught to believe

12   that, you know, you need to stockpile weapons or ammunition to

13   be ready for government attack on your apartment.  Those

14   weren't the values that he was raised; that's what he fell

15   into, too deeply, in part, because his autism, and part because

16   he made a mistake, that he has taken responsibility for.  It's

17   not anyone else's fault but his, he is owning this mistake.

18   You are going to hear from him today, and he knows this was

19   wrong, and he does not need weapons or silencers or ammunition

20   or tactical vests or anything of that nature to survive.  He

21   doesn't need to be ready for a civil war or a war by the

22   government against its own people.

23           Those beliefs were beliefs that, unfortunately,

24   tragically, in this case, flourished in his mind, during a set

25   period of time.  They weren't planted there by his parents when

1  he was child.  They are not here today.  He recognizes what

2  they were, and he apologizes for them, and he is working very

3  hard to understand them.

4       He also, interestingly, has spent a great deal of time

5  in jail studying law, and I think I mentioned this in the

6  pleading, not so much to help his case, although he has been,

7  from my view, a helpful client, but he is trying to learn more

8  about the background and the structure of the legal system of

9  the United States, so that he has a better understanding of how

10  the government operates.  Part of this was motivated by the

11  fact that he, as a person who cares very much about being

12  informed about anything he is trying to do, is horrified at the

13  fact that he had no idea that it was this crime, to possess a

14  silencer.  He did not know that.

15       THE COURT:  That doesn't surprise me.

16       MR. KRAUT:  Right.  And it's not a defense to the

17  crime, of course, but it's very upsetting to Mr. Collins.  So,

18  he has taken it upon himself to learn just about everything he

19  can from a jail cell about the criminal laws that he might not

20  know about, that might not be common sense, and about the

21  structure of the government, and he is doing this on his own.

22  I didn't tell him to do this.  No one is telling him to do

23  this.  He is doing this because he knows he needs to have a

24  clear understanding of the function of the government in our

25  lives, because he fell down the wrong track.  He did not

1    understand, correctly, the function of government in our lives,

2    and it got him into a boatload of trouble, and he is very upset

3    about it.  His family is very upset about it.  He has not

4    abandoned what I consider to deem mainstream, conservative

5    values.  He still, I believe, and he will tell you, if I'm

6    wrong, but I think he believes in what we would call small

7    government; nothing dangerous about that.  I think he still

8    likely is very pro Constitution, and is concerned about things

9    that the government may do that could violate the

10   Constitution --

11           THE COURT:  Doesn't surprise me that is pro

12   Constitution.  Things that I didn't mention suggest support for

13   the Constitution.  Again, you can have your beliefs and there's

14   nothing wrong with that, but as you put it before, things that

15   prime, yeah.

16           MR. KRAUT:  Sure.

17           THE COURT:  There are people, of course, who think

18   that it is their job to define what is constitutional and not

19   constitutional conduct, and there seem to be an ever-expanding

20   multitude of such people.

21           MR. KRAUT:  I don't think the Internet helps with

22   that.

23           THE COURT:  No, it doesn't.

24           MR. KRAUT:  I completely agree with the Court, and I

25   think that those folks are similar to the group that he parted

1    ways with, the UADF, those are the types of -- from what I can

2    tell from their website, they, sort of, think they get to

3    decide what the government can and should --

4              THE COURT:  And they are not alone.

5              MR. KRAUT:  Yeah.  The point I'm making --

6              THE COURT:  Even people in government think it's their

7    job to tell everybody else what the Constitution says, and

8    butcher the hell out of it in doing so, but go ahead.

9              MR. KRAUT:  Over this last 13 months that Mr. Collins

10   has been in custody, he has researched his own erroneous

11   thinking with the same level of intensity that he initially

12   showed in going down this path, so dangerously, a year-plus

13   ago, two-years ago.

14             When he can direct his unique ability to focus on an

15   issue in a pro social way, it's a very positive thing, and

16   that's what he has been doing, and that's what we submit he

17   will continue doing on probation or on supervised release,

18   however he gets there, and for that reason, we don't believe

19   more imprisonment is necessary.

20             Sometimes imprisonment is necessary to reflect the

21   seriousness of the crime.  Sometimes it's necessary to impress

22   upon the defendant the need to change their way of thinking.

23             THE COURT:  Let's just call a Spade a Spade.  There

24   are seven 3553 factors, although seven is a miscount, because

25   there are sub factors within factors, but however many they

1    total up to being, I have looked at of them, and it is, in this

2    case, as it is in most cases, not the case that all of them

3    point in one direction, government's direction or the

4    defendant's direction, and it's not the case that there is a

5    hierarchy to which one is important or more important.

6    Different cases have their own level of concerns, and all of

7    these things must be adjusted, but it's not, kind of, a scoring

8    sheet, where, you know, one, two, three, and then you get to

9    the bottom and you say four go their way, three go your way,

10   you lose; or that you say that, you know, treatment of him is

11   more important than whatever.

12          I have listened to you, and I know what, at least I

13   anticipate I know much of what I'm going to hear from the

14   government, and it's going to focus on two things, deterrence

15   of him and protection of the public, and those are -- what ends

16   up happening is people take the 3553 factors, which help their

17   case, put them in a flag and wave them vigorously in front of

18   me, and that's what advocates should be doing, but that's the

19   concern.  It's not from -- again, I will hear from Ms. Surratt,

20   but I would be surprised if their concern was something

21   different than that.

22          MR. KRAUT:  And my argument is that more imprisonment

23   is not necessary to deter Mr. Collins or to ensure public

24   safety in the future.  It's not going to make any difference.

25   He has 13 months of a miserable time in jail, during this

1   pandemic, away from his family.  He has suffered tremendously.

2   He has experienced the loss of his career, that he worked for.

3   He has let down his family in a way that is truly devastating

4   to him, and that period of time has impressed upon him the need

5   to follow the law to the letter of the law in all future

6   endeavors.  An additional year in custody --

7       THE COURT:  Even if he determines that it's

8   unconstitutional?

9       MR. KRAUT:  Yes.  In fact, this is the best way to put

10  that particular concern.  He has been so affected by this

11  incarceration, that he now realizes, in a way he didn't before,

12  it's not his role or his job to decide what is constitutional

13  or what is not, or what is legal or what is not.  He can think

14  about those things, like any person can, of course, in our free

15  country, but he recognizes that he cannot and will not take

16  matters into his own hands, even if he feels what the

17  government is doing is improper.  He might talk about it or

18  write about it, but he will not attempt to stockpile weapons,

19  research locations or do the things that got him on the

20  government's radar in this case.

21       He has been deterred, is the best way I can put it,

22  and more prison time is not adding to that deterrence.

23       THE COURT:  All right.  As I said, I will give you

24  another shot.  Ms. Surratt.

25       MS. SURRATT:  Yes, Your Honor.  Thank you.  I will

1    start out by saying, this case is not the Holzer case, and I

2    think, in a lot of ways, that makes the sentencing

3    determination that the Court has to make more difficult.

4            THE COURT:  Oh, I agree with that.

5            MS. SURRATT:  There are a lot of competing factors

6    here, and I acknowledge all of them.  I have actually, as I

7    have been sitting here listening, I have changed a little bit,

8    what I was going to say, because I think what is most

9    interesting about what's happened this morning is it seems to

10   me that the defendant's argument has shifted over the course of

11   this litigation.

12           We were told at the beginning, and I was prepared to

13   argue this again, we've argued this before, I was prepared to

14   argue that we don't believe that this was either bluster nor an

15   aberration, and those are the two things that we have been told

16   all along.  This was just bluster, it was imagination, and

17   further, it was an aberration for this defendant to do what he

18   did.

19           I am reading between the lines here, today, and

20   hearing that it wasn't bluster and it wasn't an aberration;

21   rather, this was real, and it was driven by real fears that the

22   government was overreaching and overstepping, particularly

23   during the time of the pandemic.

24           THE COURT:  Well, I'm glad that we're not pretending

25   that it was pretense, because it was not pretense.

1    MS. SURRATT:  And that's what I have been arguing all

2    along, and it seems that we have arrived at the argument that I

3    was making from the beginning, in advocating for keeping this

4    defendant in custody, pending today's proceeding.  So, I also

5    am relieved that we're having a real discussion about what was

6    going on here.

7        Although it raises it's own separate set of concerns,

8    to the extent this was driven by real fear of the government,

9    that it's hard to reach any conclusion other than this

10   defendant was making real plans to cause harm in the community.

11   And when Special Agent Schmitt and I began this investigation,

12   we, sincerely, believed that we stopped something tragic from

13   happening.  Now, I'm not saying all of his plans could have

14   been carried out.  I think the plans, themselves, were

15   unrealistic.

16       THE COURT:  Right.

17       MS. SURRATT:  But there were elements of the plans

18   that a single man or a a couple of men could have absolutely

19   carried out, and we believe that by stepping in when we did,

20   very fortuitously.  This was not something that we had on our

21   radar.  It all happened very, very quickly.  We believe that we

22   stopped something tragic from happening; whether the community

23   or the defendant; either way, we consider what happened, in

24   this case, to be a success, both to, if what the defendant says

25   is true, shift his way of thinking, and I will get back to that

1    in a moment, or if what we believed is true, we stopped

2    something from happening in the Denver metro area, which would

3    have been much, much worse.

4         What I do find interesting though, if we are starting

5    from a premise, that what the defendant was doing was driven by

6    a sincere fear of government overreach, I do struggle with the

7    notion that a year in prison, at the hands of government, has

8    made him see the error of his ways.  So, I do worry a little

9    bit about what we're hearing at sentencing here today is

10   driven, in part, and this is always the case, 99 percent of the

11   time is the case, driven by what the Court wants to hear.  I

12   just -- it sort of defies logic --

13        *THE COURT:*  I wish I knew what I wanted to hear.

14        *MS. SURRATT:*  Um, same -- same thing, Your Honor.  But

15   it defies logic, a little bit, to think that this horrible year

16   in prison has made the defendant now come to the conclusion

17   that the government is A-okay.

18        *THE COURT:*  Let me see if I can characterize it in my

19   own way; if one believes that the government steps on necks, my

20   stepping on his neck, as a part of the government, is hardly

21   going to endear him to the government?

22        *MS. SURRATT:*  That's what I'm saying, in more words,

23   Your Honor.

24        *THE COURT:*  Yeah, I get it.

25        *MS. SURRATT:*  So, that's the government's concern.

1    Coupling that with what has been the government's view of this

2    case, from day one; that is, this was real, this was not

3    bluster and not an aberration.  It was maybe a sort of extreme

4    extension of what has always been a way of thinking, then that

5    is what is driving the government's recommendation for a top of

6    the guideline sentence, and the Court anticipated, correctly,

7    what I was going to stand up and say.  There's an element of

8    specific deterrence.  Although, I guess I acknowledge that

9    that's at odds a little bit, *I'm going to step on your neck*

10   *more.  Is that going to deter you when you get out*?  Maybe not.

11   But the other part of that is protection of the community.

12   There's also elements of reflecting the seriousness of the

13   offense, there's some elements --

14         *THE COURT:*  Which offense?

15         *MS. SURRATT:*  And I acknowledge this in my submission,

16   Your Honor.  I separate some, the conduct that led us to

17   Mr. Collins with the silencers, but they are coupled.  They are

18   undeniably coupled.  The accumulation of ammunition, arms and

19   silencers --

20         *THE COURT:*  Maybe.  Let me ask you a question.  I know

21   that the second search warrant was to go back and get the guns,

22   because it was after some deliberation between agents and your

23   office, and I think I'm speaking of you, as your office, but in

24   any event, that there was potential evidentiary value in

25   determining whether or not the silencers were adapted to or

1    would fit.  I could hear the crickets.  I have never heard an

2    answer to that question, which leads me to believe that I know

3    what the answer is.  They didn't.

4          MS. SURRATT:  Right.

5          THE COURT:  Am I going to sit here and explain why

6    people collect silencers?  No.  Why having -- probably because

7    it's ... a gun thing, I suppose.  I don't really know.  I'm not

8    disagreeing with you, that part of this thing, and I'm using

9    that as a poor description of what we have been talking about,

10   this flame expanding or growing, includes the arming of one's

11   self; that that portion of it is not distinct from the rest of

12   the danger issue that we're talking about, but we're down to

13   not quite the fly on the tail of the elephant's butt, but we're

14   down in that direction, because the helmets, the armor, the

15   guns, the ammo, all of that, is really part of this, and while

16   I won't say that the silencers weren't part of it, because I

17   think it's part of this whole arming concept, that's not really

18   where the heart was, because you have got a couple of cheap

19   silencers that are either homemade or probably -- or bought on

20   the Internet, and don't even fit anything.

21         MS. SURRATT:  I don't disagree with that, Your Honor,

22   and I think I said, in my sentencing statement, that this has

23   been an unusual case for that very reason.  Much of our

24   argument, from day one, has not been about the silencers.  I

25   will say, I think two of the silencers had been fired, so they

1    fit on some gun, and these were homemade, whether by the

2    defendant, as he claimed, or somebody else, and then that

3    person sold him the silencers.

4         I also don't find it hugely unusual that the silencers

5    didn't fit the guns located in the residence, because this is a

6    defendant, sort of, immersed in the gun cultural with his

7    family, with other people, and so the fact that, at that moment

8    in time, there weren't guns --

9         *THE COURT:*  I get it, adapters aren't the hardest

10   thing to get your hands on.  I get it.

11        *MS. SURRATT:*  So, that was never the focus of this

12   case.  All I'm saying is that, to me, the silencers are part of

13   this larger scheme that has hints of militia, hints of, sort

14   of, doing damage to government structures, and so the only

15   other thing I will end with is there's been a lot of discussion

16   about the defendant's newfound autism diagnosis, and I am

17   thankful that he now has some clarity into his own self and his

18   emotional state, and I am hoping that diagnosis will help him

19   going forward, but, to me, that is not a factor of the

20   sentencing.

21        The defendant is someone who has been successful in

22   his professional life.  It sounds like he has not been

23   successful -- as successful socially, which, now, I think he

24   understands may have been, in part, to this undiagnosed autism,

25   but it doesn't explain, it doesn't excuse, and I put no stock

1    in the autism diagnosis, in terms of my sentencing

2    recommendation, that, essentially, had no factor -- no bearing

3    on my sentencing recommendation.

4         So, for all of the reasons that we have litigated,

5    throughout this entire year-long proceeding, the government

6    does believe a 30-month sentence is appropriate, and joins the

7    probation department's recommendation, in -- probation office's

8    recommendation in three years of supervised release.

9         *THE COURT:*  All right.  Let me take ten to give my

10   court reporter a break, and then I will come out, and give you

11   some preliminary views of things, and give you round two, that

12   I said I will give you.

13        By way of teaser, if that is fair or infuriating, I

14   don't know which, I'm looking at this as the degree to which I

15   should vary upward.  Don't misunderstand, I'm not saying above

16   30 months.  I'm saying that my view of this, is there's no

17   doubt, in my mind, none, that if we didn't have all of this

18   other stuff, this would be a case where he would have been on

19   bond, frankly, you wouldn't have resisted bond, frankly, even

20   if you did resist the bond, it wouldn't have mattered, and I

21   would have given him probation, because there's no record,

22   there's a -- a history of good works.  It's this other stuff,

23   and so I'm not looking at it as, well, here is the guidelines.

24   I'm kind of looking at it as, what would I do?  Hm.  I'm fairly

25   comfortable what I would do if this were the simple-silencer

1    case, that it could have been, and now I'm saying, how much

2    different am I going to make it, because of this other stuff?

3    In its own twisted way, that translates, in my head to, I'm

4    varying upward.  How much do I vary upward?  I don't want to

5    start with, the guideline is right; should I be in the range or

6    vary downward.  Although that is the language that the law will

7    require of me, if I don't do what Mr. Kraut says, but the way

8    I'm looking at it is really starting from a two-step process;

9    one, be honest with yourself, what would you have given him

10   if ... and I know that answer.  And now the question is, now

11   what am I going to do, because of this additional stuff?  And

12   that is a different way than it's been discussed.  I'm not

13   saying that the prior discussion has been wrong.  I'm just

14   being transparent, that's the way that it's rummaging through

15   my head.

16        So, let's say five of.

17        *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

18   (Recess at 10:38 a.m.)

19   (In open court at 10:54 a.m.)

20        *THE COURT:*  Please be seated.  Before I go back to

21   where we were, at the end, I, somewhere along the way, got lost

22   in my own word salad with regard to Mr. Wesley.  One of the

23   other reasons that Mr. Wesley's comments were taken and

24   embraced by me, is that he did talk about, he did report that

25   Mr. Collins talked about having three, but I forgot to mention

1   and emphasize that Mr. Wesley saw one.  So, with that addition,

2   it doesn't really change the record, in any respect, but I

3   guess I want to start on the government's side, this time, give

4   Mr. Kraut the last word.

5           Having already teased, kind of, how I'm approaching

6   this, I suppose the question should be, why should I shoot from

7   probation up to 30 months?

8           MS. SURRATT:  You know --

9           THE COURT:  You can recharacterize that however you

10  want to, but I mean, we have been talking about it in a way

11  that's actually the inverse of the way that I'm thinking about

12  it.

13          MS. SURRATT:  That's fair, Your Honor, and I have said

14  this at numerous sentencing proceedings, it's hard to put a

15  qualitative -- it's hard to qualitatively define exactly how

16  much time a defendant needs.  Is an additional six months

17  enough?  Is an additional 30 months enough?  So I have always

18  found that the most difficult thing to articulate.

19          So as to why 30 months precisely?  I don't know.  I

20  can tell you why 30 months versus 24 months.  I will say that a

21  significant term of incarceration is warranted here, because of

22  the nature of the offense, and what I think is a continued need

23  to protect the community, and so, starting from the perspective

24  that the defendant has already served a year, it does not seem

25  like a stretch to impose an additional year or year and a half

1    in order to achieve the goal of protecting the community.  In

2    particular, since, I think, at least I have concluded from the

3    arguments today, that this is someone who truly believed what

4    he was saying, now, 13, 14 months ago.  In my mind, there can't

5    be any question as to whether specific deterrence and

6    protection of the community is a legitimate goal in this

7    sentencing proceeding, under 3553(a).

8              THE COURT:  And to be clear, I have not said it's not.

9          MS. SURRATT:  And I am not suggesting that you

10   haven't.

11             THE COURT:  And to be clear, I have in, yet another

12   case, varied up from a guideline range, because of the

13   dangerousness factor, and again, I don't -- I'm simply saying

14   that.  We don't need to talk about this case anymore -- the

15   case I'm now referring to, which is Gilreath, anymore than we

16   need to talk about Mr. Holzer, in any detail.  Each of these is

17   different.

18             MS. SURRATT:  Right.  And I am familiar --

19             THE COURT:  But all of them, kind of, sound in the

20   same arena, so to speak.

21             MS. SURRATT:  They fit into the same big bucket of

22   cases, at the very least.

23             Actually, Your Honor, I know you have asked me a

24   question that I'm stumbling over a little bit, because,

25   essentially, you are asking me why would a 30-month upward

1   variance be warranted?  But that certainly -- that is not how I

2   have been thinking about this case, and even if it was just a

3   silencer case, that's not how I would be thinking about it.

4            You originally stated that I, likely, the government

5   likely would not have opposed release on conditions if this was

6   just a silencer case and that may be true --

7            THE COURT:  Well, you couldn't, is the reality of it.

8   In this District, it's not a crime of violence.  Well, I

9   suppose you could have on flight-risk grounds.  I forgot about

10  that.

11           MS. SURRATT:  Right.  And I mean, I could have also

12  argued danger to the community, although the offense is not,

13  itself, a crime of violence; but if that's all this was, I may

14  not have argued, at least as strenuously, for detention,

15  pending this proceeding, as I did in this case, and I argued

16  very strenuously in this case --

17           THE COURT:  You always do.

18           MS. SURRATT:  Not always; I mostly do.

19           THE COURT:  I don't mean that you always argue for

20  detention.  I mean, you always argue strenuously; that's all.

21           MS. SURRATT:  Fair enough.

22           THE COURT:  No one is taking your lunch money.

23           MS. SURRATT:  But, Your Honor, I hadn't thought about

24  what position I would take on sentencing had this been just a

25  silencer case.  I don't think I would be recommending top of

1    the guidelines.  I also don't think that I would be agreeing to

2    a probationary sentence with no term of incarceration.  So, in

3    my mind, I'm not seeking a 30-month upward variance, which

4    sounds like a lot, in this case.

5            In this case I'm seeking a guideline sentence that

6    appropriately reflects all of the facts and circumstances of

7    this silencer case.

8            I will add one more thing, because this I have thought

9    about, we never would have known that Mr. Collins had silencers

10    absent everything else.  This case started because of what he

11    told CBP, and I think I can confidently say, the U.S.

12    Attorney's Office and the FBI are not going out in the world

13    and looking for people who have unlawful silencers.

14            *THE COURT:*  I agree with.

15            *MS. SURRATT:*  We have other things to do.  But, in

16    this case, we found somebody who had silencers, among a lot of

17    other things, and so when we take this case, in it's totality,

18    I don't think a sentence of 30 months is unreasonable, and it

19    also happens to be within the guideline range for the

20    silencers, the core-offense conduct.  So, that is how I land on

21    the 30-months, Your Honor.

22            *THE COURT:*  So, if the guideline range was ... let me

23    pick a range that actually is real.  If the guideline range

24    were 8 to 14, you would be telling me 14 or you would be

25    telling me 30?

1          *MS. SURRATT:*  Your Honor, in fact, Special

2    Agent Schmitt and I discussed this, I -- and I think I even

3    flagged this for Mr. Kraut.  During this litigation, I thought

4    about requesting an upward variance from 30 months, even; given

5    the totality of the circumstances and what I had believed, from

6    day one, to be extremely serious and real conduct.

7          Clearly, I'm not doing that, and I am not the doing

8    that for a reason.  I have arrived at 30 months as an

9    appropriate sentence.  So, I think if the guideline range was

10   lower, I think that it is realistic that I would have sought an

11   upward variance from the guideline's range, based on everything

12   that we know about this case.

13         *THE COURT:*  All right.  Mr. Kraut.

14         *MR. KRAUT:*  Thank you.  Thank you, Your Honor.  First,

15   I just wanted to address the point that was made before our

16   brief recess there, which was that the point, I think, is a

17   rather cynical view of Mr. Collins, that this last 13 months in

18   custody will have not endeared him any to the government, and

19   thus, is unlikely to generate the type of mental turnaround

20   that I have promised the Court has occurred.

21         It's just -- I call it a cynical view of Mr. Collins,

22   because I think it is, and because he -- that might be true of

23   a lot of people.  Like, I understand the, sort of, instinctual,

24   logical appeal of that argument.  You step on someone's neck,

25   they are not going to be mad about it.  They are not going to

1    start feeling better about the government; that's probably how

2    I would feel, to tell you the truth, knowing myself.

3          Mr. Collins is very different than most people in this

4    regard.  He looks inward, and he has been looking inward.  He

5    has not blamed the government for this last year that he has

6    spent in custody or for, really, any of this.  He has blamed

7    himself, and I know that seems hard to believe, because it's so

8    unusual, and we all put ourselves in that situation and think,

9    man, I would be so upset with the forces or the authorities

10   that are doing this to me; I don't deserve this or, you know,

11   I'm the victim; all of these thoughts that sometimes Courts

12   hear from defendants.  I have never once heard that from

13   Mr. Collins; that's not how he views the situation.  It's

14   because his personality is so different, so unique, which I

15   think is because of the autism, that he really doesn't feel

16   that way.

17         He has, as I said, looked inward.  He believes this is

18   his fault.  He is right, it is his fault.  Of course, I think

19   he should have been on bond, as I argued just as strenuously

20   from my position months ago.

21         THE COURT:  Well, you are not giving up your lunch

22   money either.

23         MR. KRAUT:  Right.  But that issue was resolved,

24   Mr. Collins accepted his fate, as a person who is going to be

25   in pretrial custody, and as I said before, really used this

1   time to learn more about how the government functions; not --

2   this time in custody has not generated a resentment towards the

3   government, in him, in the way that it might in others.  I just

4   wanted to say that.  And I know it's hard to prove that.

5   That's my perspective from working with him.  I hope that the

6   Court hears that from him, or at least believes me about it,

7   but that's my perspective on that.

8          I was -- I'm glad to hear the Court's general approach

9   in sentencing here, as thinking, well, without all of this

10  other stuff, this looks like a probation case; client has no

11  criminal history; no one was injured in the offense; it's a

12  possessory offense; and none of the silencers fit any of the

13  guns.  All of those factors, I would agree, in a

14  normal-silencer situation would certainly justify a probation

15  sentence.

16         In terms of the upward variance to, sort of, misuse

17  that term, from that starting point, my position is the correct

18  additional penalty, for all of this other stuff, is the time

19  that he has been jail.  And I know you knew I was going to say

20  that, but that's my view of this; is that, this penalty that he

21  has been in custody for these last 13 months, has been very

22  harsh for him, and that what is the additional penalty that

23  he -- that is warranted by that extra conduct, and by denying

24  the bond appeal -- or I should say granting the government's

25  bond appeal, and denying my motion to release him, the Court

1    ensured that there would be community safety while this case

2    was pending, in terms of keeping Mr. Collins in custody, and

3    that happened, and it has been very painful for him.

4          As a secondary consequence, a collateral consequence

5    that this Court cannot control, what I think should consider,

6    in assessing the penalty that he has already suffered, is the

7    loss of his career.  I have talked about it before, and I know

8    no one here tries to minimize this, but Mr. Collins had a very

9    unique, highly trained set of skills, that he won't be able to

10   use again, and that has been very, very hard for him, and is a

11   piece of the punishment he already served, even though the

12   Court didn't intend for that to happen, and didn't impose it as

13   a sentence, and would never, that's part of the sentence that

14   he will serve, and that's part of a sentence that he will serve

15   for the rest of his life.  I cannot imagine a situation where

16   he is granted permission to fly an airplane.

17         *THE COURT:*  I don't want to minimize that, these

18   things are always tricky.  He loses his career; is it something

19   that can be considered?  Yes.  Is it something I have looked

20   at?  Yes.  Flip it around, I got some poor guy who doesn't have

21   a career.  I have got to give the janitor more time?

22         *MR. KRAUT:*  No.

23         *THE COURT:*  I know you are not saying that.

24         *MR. KRAUT:*  Of course not.

25         *THE COURT:*  But I'm just saying the loss of career is

1    not anything that I have done or that I control or, frankly,

2    that I care much about.  Although I do acknowledge that it is a

3    significant consequence.

4         MR. KRAUT:  That's correct.  And every case brings

5    it's own unique set of consequences.  Some clients get

6    deported, some clients get separated from their children.  He

7    doesn't have those concerns; instead has this loss; it's a loss

8    that he suffered because of his actions.  It feeds directly

9    into my argument about deterrence, which is that, to the extent

10   that anyone believes suffering is necessary to deter future

11   criminal behavior, Mr. Collins loss of his career is a

12   significant component of that suffering.  It has already

13   happened and will continue to happen.

14        Now, the research that I cited, in the motion for a

15   probation sentence indicates that, in fact, deterrence comes

16   from the knowledge of getting caught, not from pain.

17        THE COURT:  Your office always cites that.  I want to

18   put a sign up on the door that says stop telling me about that

19   DOJ study.  It does not move me one inch.  I thought that I

20   consistently saying that to your staff, I would stop hearing

21   about it.

22        Look, I know that study is there, and my view of it

23   is, take that and run to Congress, because it doesn't do

24   anything for me.  If you over penalize it hurts.  The real

25   thing that is -- that is deterrence inducing, is increasing the

1    likelihood of getting caught.  There is nothing that I do, or

2    can do, that increases the likelihood of anybody getting

3    caught.  That's not my ... my shtick, so to speak.  I don't

4    have any control over that; that's enforcement; that's

5    Ms. Surratt' universe; that's the DOJ's universe.  So, guys,

6    DOJ, go run wild, make sure everybody gets caught.  I don't

7    know what else you want from me about that, but I'm not going

8    to sit there and say, because there's this study, that, without

9    any numbers, and without any rooting in any individual, says,

10   there is a point at which it has diminishing to -- forget

11   diminishing -- to no return to negative consequence.  Okay.  I

12   can accept that.  I don't know what that point is, in terms of

13   that DOJ study, and I don't know what it is in terms of

14   Mr. Collins, at least on the basis of that DOJ study.  It's a

15   nice thing to talk to about someone with a doctorate in

16   philosophy, perhaps, but it doesn't move the dial for me.

17           *MR. KRAUT:*  Well, let's -- let's -- okay.  So we have

18   a disagreement, there.  I think it's about the perception of

19   being caught, which only occurs when a person is on probation,

20   that's where the real deterrent factor sets in, but I

21   understand the Court is not moved by that particular study or

22   arguments, based on that.

23           However, what about the Supreme Court's analysis of

24   the fact that probation itself is punishment?

25           *THE COURT:*  You don't have to tell me that.  I have

1  said that on the record in multiple case.

2          MR. KRAUT: And that's exactly -- and I know that.

3  And I think that that's a piece of our argument, as well, is

4  that, whether you call it deterrence or punishment or just

5  punishment, the probation sentence, itself, will contribute to

6  or satisfy that statutory concern.

7          The government has raised, as we all knew they would

8  and expected, and as it is their job, protection of the

9  community and deterrence as the two factors that require what

10  they view as additional prison term.  The question that I don't

11  think the government has answered is how, exactly, will an

12  additional period of imprisonment deter Mr. Collins or protect

13  the community in a way that the last 13 months he has been in

14  custody won't?

15          What is the additional return on of extra six months,

16  and extra year, extra year and a half behind bars for this

17  particular person?  I don't think there is any, that's why

18  we're asking for the functional equivalent to a time-served

19  sentence.

20          We've got Dr. Huckabee, who analyzed Mr. Collins,

21  after multiple meetings, reaching a conclusion that he did not

22  pose an ongoing threat to the safety of himself or the

23  community, and --

24          THE COURT: Yeah, and I accept that, I acknowledge it,

25  I consider it.  I think it was also the conclusion that this

1   was just like a comic book and that's not where any of us are.

2        *MR. KRAUT:*  Right.  I don't believe -- I wish

3   Dr. Huckabee was here, I supposed, to address that line of

4   questioning or phrasing, and I don't want to try to put words

5   in her mouth.  I don't view that as really what Mr. Collins was

6   doing.  This wasn't about entertaining himself, in the sense

7   that writing or reading a comic book would be.  So, I agree

8   with the Court about that.

9        *THE COURT:*  And I didn't mean it in the sense of

10  entertaining him.  I mean, it was totally fiction, what is it

11  that people do now, is it cosplay, is that what it is?  It

12  wasn't that, and, you know, look, the doctor has her opinion, I

13  have heard it, I have considered it, but I don't -- the last

14  thing I do is let others bear the weight of what the decision

15  should be, because, certainly, if she said he is dangerous and

16  should be locked up for the rest of his life, you would be

17  telling me that she is a lunatic.

18       *MR. KRAUT:*  Well --

19       *THE COURT:*  -- or not even talking about it at all.

20       *MR. KRAUT:*  Yeah, right.  As part of our proposed

21  probation conditions, which could also be supervised release

22  conditions, we're asking for a six-month, in-home detention

23  period, that adds to the punitive nature of a community

24  supervision sentence.  The conditions that we expect and that

25  we request are quite strict.  We have not objected to any of

1    the probation office's recommended conditions or special

2    conditions.  They limit Mr. Collins' access to the Internet,

3    dramatically, in a way that we propose, sufficiently, but not

4    greater than necessary, addresses the government's public

5    safety concerns.

6            The bottom line, Your Honor, is that Mr. Collins has

7    absolutely no criminal history.  He was, to some extent, primed

8    for a misunderstanding of the role of government.  He developed

9    that misunderstanding and ran with it in a dangerous way.  He

10   did not harm anybody directly or indirectly.  He did not injure

11   another person, many of the plans he made, as everyone agrees

12   were extraordinarily unrealistic, regardless of what he may

13   have wanted or actually believed, and over the last 13 months

14   he has suffered tremendously, has thought about his errors and

15   his mistakes in judgment, in a way that I think can be fairly

16   described as obsessive.  He has been thinking about it

17   constantly.  He has been very worried about how this Court will

18   perceive him today, and very worried about his future and how

19   he can make sure that he has the bright future that he once

20   did.

21           I'm very hopeful for Mr. Collins, and I think that my

22   hope is realistic, and I ask the Court to share my hope for his

23   future.  It's realistic, because he has a very supportive

24   immediate family.  He has an incredibly supportive network of

25   people, both through The Church of Latter-Day Saints, based in

1   South Carolina, as well as his parents' friends and their

2   families, who all have banded together to be ready to accept

3   Mr. Collins with open arms, back in their community, make sure

4   he is employed and surrounded by pro-social individuals.

5           I don't think I have ever submitted quite so many

6   letters of reference and job opportunities as I have in this

7   case, that's why I created these tables, because I lost track

8   of them, and if I'm losing track of them, I have to assume

9   other people are too.

10          This is a very, very, unique case.  Mr. Collins is --

11  is a person who made a severe mistake, has paid for it, does

12  not need further imprisonment to deter him from doing this

13  again, and it's my view that the community does not need for

14  him to be imprisoned for any additional amount of time.  So,

15  we're asking for this probation sentence.  Thank you very much,

16  Your Honor.

17          *THE COURT:*  All right.  If you would have Mr. Collins

18  please join you at the podium.  I want you to give him the

19  inside position.

20          All right.  There are several things, sir, that I want

21  to tell you.  If, at any point, along the way, one of these

22  instructions is not understood, you just let me know and I will

23  clear it up.

24          *THE DEFENDANT:*  Yes, sir.

25          *THE COURT:*  The first thing is this, this is your

1   opportunity to speak.  Because it is your opportunity, I,

2   obviously, give it to you, but you need to understand that you

3   are under no obligation to speak.  You can, if you wish to.

4   You can also not, if you wish to.

5        Second, if you choose to speak, there's no restriction

6   on what it is that you can talk about, nor is there any

7   obligation on you as to what to talk about.  What I mean by

8   that is this, you heard me say some things, you have heard

9   Ms. Surratt say some things, you have seen Ms. Means report

10  some things, and the -- the burden is not on you to pick up

11  everything that somebody has said, and to have a retort or

12  rebuttal or reply.  You get to choose what it is you want to

13  talk about.

14       The third thing is, and I don't think this would be a

15  problem with you, is don't worry about slips of the tongue.  I

16  don't care one whit.  I'm not expecting profanities to cross

17  your lips, but what I'm telling you is that if -- even if you

18  did have such a slip of the tongue, it would roll off my back

19  like water off a duck, because I'm interested in what it is you

20  have -- what it is -- what's the content of what you are

21  saying, not the presentation.

22       And then, finally, what I will tell you is this, I

23  understand how difficult it is to be in your position and

24  address the Court, and there are times when, in COVID times

25  people are faced with an odd choice.  I give you the full

1   choice.  What I mean by that is this, some people want to keep

2   the mask on for personal medical attention, concern, safety,

3   that's all fine.  I'm making no comment, whatsoever, with

4   regard to that.  Sometimes people are concerned behind the mask

5   they're just not able to convey, as well, to the person that

6   they are speaking to.  I can tell you that that's less of a

7   concern two years into looking at people behind masks, but I

8   give you the option, if you wish to, to remove the mask during

9   your statement to the Court.  Because I give that option, I

10   also give Mr. Kraut the option, to do what he thinks is

11   appropriate, and I suppose the same is true for Ms. Surratt,

12   she could, I suppose, slide a little bit to her right, but I

13   don't expect her to do so.  Mr. Kraut may or may not create

14   some additional distance.  If he does, do not interpret that in

15   any way as any comment on you.  I'm not going to interpret it

16   in that manner.  I'm going to interpret it simply as him doing

17   what he feels is best for him and you, by way of medical

18   issues, and so, in other words -- this one time, what I would

19   tell you is, ignore your lawyer.  All right.  With that, the

20   floor is yours.

21        *THE DEFENDANT:*  Okay.  Let me blow my nose first.

22   Sorry.  I know you guys want to hear that.

23        So, I have got like a page and a half, and I am going

24   to make a little comment about something, an observation that I

25   made in jail, when I -- I -- guys had been talking about how,

1  you know, me not wanting the government's boot on my neck or

2  something like that.  You know, the 14 months I have been in, I

3  prefer you guys over the you know, I -- I have met many people

4  who are very dangerous in jail and... I'm sorry.  Anyways, I

5  would prefer --

6         THE COURT:  There's no reason to apologize and there's

7  no time limit on you.  So if emotions occur, you are not the

8  first, you won't be the last, don't apologize.  It's okay.

9         THE DEFENDANT:  Okay.  Well, just to get the record

10  straight, I would prefer you guys over anything.  You know,

11  there's good people in jail, but there's also really bad people

12  in there.  I appreciate it.

13         You know, I grew up in a sheltered environment.  I

14  never -- I never been in court before.  I never... honestly, I

15  stayed pretty far away from -- for most of my life, criminal --

16  criminality and experiencing it in jail, is where I realized

17  holy shoot; that's pretty much what changed my mind.  I was

18  like... but anyways, I'm going to read this.

19         Your Honor, I respectfully submit myself for judgment

20  to your court, and I remember this comment you made during

21  my -- my bail hearings, you said, I was bucking the

22  establishment, and that's what's been motivating me all of

23  these months, and it's allowed me to think about the things

24  that I have said and done.

25         I was, initially, upset that you denied my bail, but

1    now that I saw it as an opportunity to consider my behavior and

2    beliefs, and if I had been given bail, I probably would have

3    worked -- kept working, and didn't work with my case, and maybe

4    not have thought about it as much as I -- as I would have, at

5    this instance.

6            But I understand now that I was senselessly bucking

7    the establishment, at the cost of my family and friends and the

8    community.

9            I spent 14 months in jail, and there's a lot of -- a

10   few things I would like to share with you and the Court, and it

11   consists of reflections during lockdown, and insight to who I

12   really am, and my plans on how I will make things right, so you

13   may be able to understand who I am outside the harm I have

14   caused.

15           I don't know if you are a James Madison fan, but I

16   thought, after my experience in jail, this is a very stark

17   reminder.  He said, if men were angels, no government would be

18   necessary, and we are all human, none of us are angels.  I most

19   definitely am human.  I was subject to carelessness, ideology

20   and ignorance, and my family, again, my family, friends and

21   community have been hurt from it.

22           I was careless in the interview.  I should have

23   realized what I was getting into.  My ideological concerns of

24   government and COVID-19 overrode my common sense and

25   perspective.  I was -- and I was also ignorant of the laws that

1   keep our society orderly.

2         I realize that my human mistakes have real-world

3   consequences.  My family has driven, I don't know, at least

4   five times across the country to come visit me or to be at my

5   court hearings.  I mean that's probably like 1300 miles, each

6   way.  The -- when -- when they shouldn't have to be spending

7   money to support me, in jail, that's, you know, but that was a

8   mistake I made.

9         They worry about my future, and my dad had black hair,

10  entirely black hair before all of this, and now it's all white,

11  and I feel responsible for that.

12        My landlord, Susan, she treated me like a son, trusted

13  me with her home and family, and I broke that trust with my

14  poor actions, and, of course, you know, the government doesn't

15  trust me anymore, so that throws my career to the wind, and I

16  wanted to fly, you know, a Boeing 787 at some point in my

17  career; that's not going to happen now.  No point in even

18  thinking about it.

19        So, I have -- I am trying to take responsibility for

20  my actions as much I can while I was in jail -- while I am in

21  jail.  My actions were belligerent, ignorant and careless.

22        A pilot is required to know all aviation regulations

23  involved in a flight.  So, when I'm flying from Denver from

24  Cortez, I'm supposed to know every little regulation regarding

25  that flight, and I don't understand what possessed me not to

1   look at the law for possessing a silencer.  I just ...

2   sometimes I think it was sheer laziness or something like that.

3   I don't know.

4        I'm sorry for what I did wrong.  I was human.  I am

5   human, but it's no excuse, but luckily, not like the rest of

6   the animals in this planet, we can learn from our mistakes and

7   that's what I intend to do.

8        This is part of the introspection I have done in jail.

9   I kept asking myself the question, how did I end up here?  Not

10  just talking about the offense, and I am talking about the --

11  my values and beliefs that directed the choices I made that

12  brought me to this court.

13       In the detention hearing, the prosecutor suggested I

14  have character flaws.  Our choices and beliefs -- our choices

15  and beliefs make up the total sum of our character.  Someone

16  had told me that once.  Um... anyways, I thought it was pretty

17  spot on.  And I definitely made some bad choices in 2021.  One

18  of my character flaws is I can be a pushover.  I have let other

19  people influence my beliefs and change my priorities in life.

20       When I was worrying about COVID, in the short-term, I

21  should have been looking at my long-term career plan.  And

22  another -- another character flaw I have is sometimes I get

23  focused on something so singular, I let other aspects of my

24  life fade away and neglect them.

25       Just as an example, I had -- when I was working, I had

1  two weeks of vacation, and I am sure all of you guys take

2  vacation, you know, and I never used it because my life was so

3  imbalanced, you know, just wasn't, you know... things weren't

4  right.

5         I do have at least one good character trait, something

6  that I feel I have had most of my life.  I can admit when I'm

7  wrong, and it kept me safe in the air.  Nobody likes the overly

8  confident pilot who thinks he is right all the time, and it has

9  helped me understand my situation in here.

10        I understand exactly what brought me to this place.

11 No one just ends up in a federal courtroom.  Usually the --

12 usually a train of mistakes.

13        I have spent the last year dissecting my life, and

14 what made it go this direction, and I have identified at least

15 four -- four very specific things that I was wrong about and

16 I'm working really hard to change.

17        I was wrong about my short-sighted reaction to COVID.

18 You know, for example, you know, I was -- I didn't think it was

19 a big deal, and it wasn't until I went to jail and heard about

20 this -- there was one guy, he lost three of his family members

21 in like just a few months, and that really changed my opinion

22 of it.

23        And, honestly, I was incorrect about my feelings at

24 work; the pay being cut.  I was one of the lucky few pilots who

25 actually didn't get furloughed.  I should have been grateful

1    for that.

2         I was wrong about the severity of government

3    overreach.  Again, like when I said in the beginning, I have

4    never experienced -- I have never come face-to-face with really

5    truly dangerous people, and I know that's kind of a strange

6    thing, but I have to say thank you for what you guys do here,

7    because my padded life couldn't have been possible without what

8    you guys do in here.  I'm not saying that there's not good

9    people in jail, but, you know, I understand the need of what --

10   what your jobs here are, and I much prefer that you guys be in

11   charge than them.  The -- the people who brutalize each other.

12        And number four, I was ignorant of the law regarding

13   silencers; that's no excuse.  I should have -- I should have --

14   you know, just like when I'm going to a flight, I look at

15   regulations I need to know a little bit more about.  I should

16   have done that.

17        These are the main things I feel that got me here,

18   today, and I have devised a plan to live my life better.  I

19   read a study about how, you know, a college degree helps reduce

20   recidivism, and I have done a ton of reading about how it

21   helps, and so my plan is, you know, during supervised release

22   or probation, I'm going to finish school.

23        First, I'm going to get a certificate in -- as an

24   electrician, to help pay for school, but that's my plan for

25   that.  I plan on trying my best to rebuild the trust of the

1    public and my family, volunteering on weekends, no matter what

2    I need.  Do anything I can.  I have a few ideas about that.  I

3    plan on working full-time.  You know, idle hands are the

4    devil's workshop, or something like that.  It's -- and I know,

5    I know I have, you know -- I'm not using autism as an excuse.

6    I said things that were, you know, regretfully disturbing, and

7    I, you know, did some things that weren't at best, and I plan

8    on getting as much help as I can to understand this -- this

9    autism thing, that I, honestly, I always wondered what -- I

10   always had social problems growing up.  I don't know what, you

11   know -- I have known about autism.  I just never thought it

12   could have been me, honestly.  But a little bit of

13   introspection goes a long way.  So I plan on doing as much as I

14   can, especially to seek professional help with my autism and my

15   mental and emotional issues.

16          I plan on spending as much time as I can with

17   constructive family and friends and people who care about me.

18   All of those -- I have read those letters, and all of those

19   people that had good things to say about me, and it just

20   really -- it just tears at me that, the things that I wrote

21   down, the things that I said, was not becoming of me and what

22   they thought of me, and I hope I can live a better life, make

23   it up to them somehow, and if there's any, you know -- I'm not

24   sure if I want to know how much it costs for -- to for this

25   whole ordeal.  Maybe one day I will find out.  But I definitely

1    will pay my taxes, pay any debts or fines that I have entailed

2    because of this.

3         I think two of the most powerful -- I'm reading a ton

4    of books, and two of the most powerful books that I have read

5    were from this psychologist named Jordon Peterson.  He is

6    some -- he is a Canadian.  I don't know that necessarily means

7    anything, but he has two books, one called 12 Rules For Life,

8    and Beyond Order, And my folks had sent me those books, early

9    on, in my jail time, and that's where -- that's what has really

10   helped me build, kind of, my push to become better, and to

11   recognize when I'm wrong, and I just took things way out of

12   proportion, and don't -- anyways, I don't have much else to

13   say, but I do have to say thank you for all your time here.

14        I have a lot of regrets and I hope I can become a

15   better person to make sure that I don't come back to court, and

16   be a good outstanding citizen, I guess.

17        I'm trying really hard, and thank you for listening.

18        *THE COURT:*  All right.  Stay there, please.  In

19   fashioning a sentence here today, I have considered the

20   Presentence Report, all matters relating to that report, that

21   have been filed by the parties.  I have considered the argument

22   that's been had here today.  I have considered the statement of

23   the defendant.  I'm mindful of the fact that the law requires

24   that I impose a sentence which is sufficient, but not greater

25   than necessary, to achieve the purposes of sentencing, as

1    described in 18 USC 3553.

2          In fashioning that sentence, I have considered, both

3    individually and as a whole, all of the 3553(a) factors, which

4    must be considered in determining a sentence, specifically,

5    including those that have been discussed and emphasized by

6    counsel here today.

7          I'm also aware of the fact that in making this

8    statement, I'm mostly talking to lawyer and Judges and the

9    Court of Appeals and probation officers, because all of this

10   gibberish about 3553, doesn't mean a whole lot to a layman and

11   I appreciate that.

12         What I do is I tell you what it is I'm going to do by

13   way of a sentence and what it is -- why it is that I am going

14   to do what I'm going to do, and I then give counsel an

15   opportunity to make any record, because it is possible that I

16   may make some legal error in imposing sentence, and I,

17   obviously, would correct that, if it were brought to my

18   attention.

19         Let me start with saying a couple of things that apply

20   to you and apply to every case.  I don't go around trying to

21   decide who is a good person and who is a bad person.   It

22   certainly factors in some cases, but that's not really the

23   object.  Good people make bad mistakes; bad people do bad

24   things; bad people don't violate the law; good people do.   And

25   I suppose what I'm saying to you, in giving all of those

1    different scenarios, is that I'm not here passing judgment on

2    you and your life as a person.  What I'm trying to do is trying

3    to figure out what I think about the circumstances that have

4    brought you here, and whether those circumstances, looked at

5    from a lot of different perspectives, mean that I should give

6    you acceptance, as opposed to Y sentence as opposed to Z

7    sentence.

8           It may or may not be obvious to you, by now, but I

9    spend a great deal of time, particularly in cases that I know

10   to be difficult, in trying to look at it, think about it and

11   approach it, listening to what probation says, listening to

12   what government and your lawyer say, and, frankly, thinking

13   about it on my own, completely independently of anything that I

14   have been told by anyone.

15          The issue with me is that there are things that have

16   occurred that I, somewhat, touched upon, but this is not

17   something that just popped up, because of COVID.  It may have

18   been that's what fanned the flame.  It may have been that's

19   what caused the views that you have to -- to have evolved to a

20   counterproductive place; but it's not that COVID caused a

21   transformation in your views.

22          One of the little things that I look at, in addition

23   to everything else that I have been told, I think back to the

24   bond hearing, and I recall trying to figure out whether or not

25   you had been fired or quit or whatever it was with regard to

1    your job, and being told something that has not been mentioned

2    since, and that is that while you were working at Boutique Air

3    you lost your privileges at DIA because there was some

4    objection that you had to TSA, also known as the government,

5    searching your bags or something along those lines.  In other

6    words, you get to decide.

7            I will tell you that I have never, ever been

8    successful in trying to figure out what it is that somebody

9    uses as a code on their iPhone or iPad.  I had a brother die,

10   and I needed to get into his phone and I never could.  My wife

11   has even told me her password, and I screw it up every single

12   time.  And when I was watching that video, I was saying, *I know*

13   *what it's going to be.  I know what it's going to be, I know*

14   *what it's going to be*, and it was, and you know what it was.

15   1984, George Orwell; that's the view of government.

16           I have looked at the conduct after the search, and

17   there's still this notion that pervades the search, that

18   somehow you get to dictate to others how things are going to

19   be.  It's a fine line between exercising your rights and

20   viewing yourself as in a position of power.  At the time of the

21   search, *I want all of your cards*, as if that means anything to

22   agents.  It doesn't.  Put them on T.V., a lot of stuff goes on

23   T.V.

24           Afterwards, when it's clear that this is an extremely

25   serious matter, what are we thinking about?  Ways of counter

1    attacking, putting Ransomware in.  Could you have done it?  No.

2    The notion that you armed up, and I mentioned this, not because

3    I'm concerned about Second Amendment rights, but I'm simply

4    saying that this interview, that you were careless at, it's not

5    the fact that the interview occurred and that you were

6    careless, nor is it the fact that others seem to think that you

7    were taken advantage of by the interviewer, the interview

8    simply allowed people to see behind the curtain, to see what it

9    is that you were on the verge of, at least in your mind, doing;

10   that's what happened.  And the most concerning, to me, I have

11   already mentioned, as I have said, that there is some -- this

12   didn't spring out of nowhere, and I have, hopefully, explained

13   that I'm not being critical of anybody else's beliefs, but this

14   is not something that just popped up, due to COVID.  The most

15   concerning to me is, again, something that has been barely

16   touched upon; this wasn't just what you were thinking; this

17   wasn't just what you were writing; this wasn't just cute little

18   games of, you know, putting in passwords that have double

19   meanings; it wasn't just about exercising Second Amendment

20   rights; it got to the point where it was impacting your

21   associations.

22          You associated with the UA -- I think it's UADF or

23   UDAF; DF being, defense force, or some nonsense, and then then

24   your views and theirs differ.  So what did you do then?  You

25   went and looked for more people with those extreme views, and

1   contacted or became involved with the Council of Colorado and

2   even suggested to them, the plan to take down Denver.  We can

3   talk and we have been talking about, you know, this was fantasy

4   and nothing was ever going to happen and you didn't have the

5   ability.  You didn't have the ability to pull it off, but if

6   those people had taken an interest in your suggestion, I have

7   no doubt that something would have happened.

8        If you encountered the idiots that will be on trial,

9   with regard to the attempt or plot to kidnap the Governor of

10  Michigan, I have no doubt that you would have been sucked into

11  that, as well.

12       What do these things mean?  It means it's not fantasy.

13  It's not comic book.  It's not something that I will just brush

14  aside; and it's not autism.  But I'm also aware of the fact

15  that you have it and it's clear to me, from the doctor's report

16  and from your statement, that you have it, and I do think that

17  you can lock into things and you may be more suggestible than

18  others, but I would be wrong and I would be lying to myself,

19  and I would be lying to you to say you got led down the

20  primrose path by somebody else.

21       You took a path and you grew with it and you

22  experimented with it.  You thought about it and you let fear

23  drive you to certain places, but it's not as if a light switch

24  went on and you went from dark to light or light to dark.

25       I have looked at it, and there's more there than a

1    confused young man.  I also don't think that you have not been

2    impacted.  If you have not received the message, I don't know

3    what else would send that message home.  I'm not saying full

4    message, because let me tell you something, if you think that

5    the detention center is bad; it's nothing.  They would chew you

6    up and spit you out at a USP, and I don't mean that as an

7    insult to you.  They would chew me up and spit me out at a USP,

8    as well.

9         I'm not going to give you probation and I am not going

10   to give you time served.  I'm going to give you 18 months.  I'm

11   doing it for reasons that have to do with my characterization,

12   which I have tried to lay out on this record.  My approach

13   is -- my approach to this, which is also backwards, and I will

14   tell you, Ms. Means, you go right ahead and enjoy yourself in

15   terms of figuring out which box to check on the Statement of

16   Reason.  I'm viewing this as upward variance, but you have to

17   report it as a downward variance.

18        None of that is anything other than lawyer's talk,

19   which you shouldn't be worried about.  My view of it is that's

20   a sentence that's merited by the conduct.  As I said, I'm not

21   terribly moved by the silencer, but the rest of it merits an

22   upward variance, and that message should be sent and will be

23   sent.  I don't need to overdue it, and I want to make sure that

24   I pick a sentence that I do think is appropriate, in terms of

25   protection of the public.  I want to make sure that I don't

1    clip the incarcerative sentence that you have experienced, thus

2    far.  You are going to go through all of the rest of it.

3    There's not a lot left to do.  You are going to get three

4    months good time on 18.  You are down to 15.  You have got a

5    couple left.  Maybe at the designation they leave you in, maybe

6    they segue you to a halfway house, which is the way most people

7    experience the termination of their sentence, but you are going

8    to get the full experience.  I'm not going to pull the plug on

9    it now, but I don't think I need to do more than that.

10          I have tried to balance the views, and they are

11   competing and each side is fully, fully understandable in their

12   views and in their position.

13          I think you understand some of what's gone on.  I

14   don't think you still get it.  It wasn't a mistake.  It was a

15   choice.  It wasn't carelessness.  It was deliberation.  And it

16   was a dumb-ass idea from the outset, and there's a price to

17   pay, and I am going to impose it, but I'm not going to pile on;

18   18 months; the terms and conditions of supervision as set forth

19   in the recommendation of the probation department; no fine;

20   hundred-dollar special assessment, because I'm required to do

21   so.  There's no restitution that's available here.

22          I don't intend to make any kind of recommendation to

23   the BOP in terms of a facility.  Again, I understand, parents

24   think South Carolina is so much worse than Colorado, and that's

25   really not for them to say, and honestly I don't know that

1    making a recommendation means anything, because, at best, I'm

2    not sure that they would put him into a transfer facility

3    again, anyway; it seems, somewhat, pointless; but that's what

4    it's going to be.  Government?

5              MS. SURRATT:  Nothing further, Your Honor.

6              THE COURT:  Mr. Kraut?

7              MR. KRAUT:  Nothing further.  Thank you, Your Honor.

8              THE COURT:  Then I'm now going to speak in language

9    that sounds contradictory to everything that I have just said,

10   but that's just because I have to characterize this in a

11   particular way in order to conform to what the law says.

12             I do find that there's a reason to vary downward from

13   the guideline range.  The reason is, as I have explained, on

14   the record.  I leave to Ms. Means' dart throwing to hit the

15   right box.  I suppose I would say, it's a combination of the

16   nature of the offense and the history and characteristics of

17   the defendant, but it is as more fully expressed by me on this

18   record.

19             Pursuant to the Sentencing Reform Act of 1984, it is

20   the judgment of the Court that the defendant,

21   Ethan Jeffrey Collins, is hereby committed to the custody of

22   the Bureau of Prisons to be imprisoned for a term of 18 months.

23   Upon release from imprisonment, he shall be placed on

24   supervised release for a term of 3 years.  Within 72 hours of

25   release from the custody of the BOP, he shall report, in

1   person, to the probation office in the District to which he is

2   released.  While on supervision, you must not commit another

3   federal, state or local crime.  You must not unlawfully possess a

4   controlled substance.  You must refrain from any unlawful use

5   of a controlled substance.  I waive any mandatory drug-testing

6   provisions that are applicable, because there's a low risk to

7   no risk of future substance abuse by this defendant.

8        You must cooperate in the collection of DNA, as

9   directed by the probation officer.  You must comply with the

10   standard conditions adopted by in Court in General Order

11   2020-20.  I do find that there are special conditions of

12   supervision that are reasonably related to sentencing factors,

13   and which do not involve a greater depravation of liberty than

14   reasonably necessary to accomplish the goals of sentencing.

15   They are five in number, they are these.  One, you must

16   participate in a program of mental-health treatment, approved

17   by the probation officer, and follow the rules and regulations

18   of such program.  The probation officer, in consultation with

19   the treatment provider, will supervise your participation in

20   the program as to modality, duration and intensity.  You must

21   pay for the costs of treatment, based on your ability to pay.

22        Two, you must submit your person, property, house,

23   residence, papers, computers or other electronic communication

24   devices or data-storage devices or media or office to a search

25   conducted by a United States Probation Officer.  Failure to

1    submit to search may be grounds for revocation of release.  You

2    must warn any other occupants that the premises may be subject

3    to search, pursuant to this condition.  An officer may conduct

4    a search, pursuant to this condition, only when reasonable

5    suspicion exists that you have violated the conditions of your

6    supervision, and that the areas to be searched contain evidence

7    of this violation.  Any search must be conducted at a

8    reasonable time and in a reasonable manner.

9         Three, your use of personal or family-owned, lease or

10   rented computers and Internet capable devices will be limited

11   to those computers and devices you request in advance to use,

12   at which the probation officer authorizes.  Authorization of

13   any such computer or device shall be based on the ability of

14   the computer or device to be effectively monitored by

15   monitoring software, utilized by the probation officer.

16        You must disclose any user names or identifications,

17   passwords, for all authorized computers or Internet-capable

18   devices to the probation officer, and keep that disclosure

19   complete and up to date.

20        Four, your use of other computers and Internet-capable

21   devices is prohibited, except to the extent that such other

22   computers or devices need to be accessed; one, for emergencies;

23   two, for completion of routine transactions at commercial,

24   health or religious, brick-and-mortar establishments; three,

25   for the completion of employment or formal education duties and

1    responsibilities; four, for voting and census reporting; or

2    five, as otherwise approved by the probation officer.

3            The probation officer shall approve use of such other

4    computer or device, absent reasonable suspicion that the

5    defendant is using such computer or device to circumvent the

6    monitoring of his personal or family-owned, lease, rented

7    computer or other device.

8            Five, you must allow the probation officer to install

9    software and/or hardware designed to monitor activities on any

10   personal or family-owned, leased or rented computer or

11   Internet-capable device.

12           You are authorized by the probation department to use,

13   this monitored software may be -- excuse me -- may record any

14   and all activity on the device, including the capture of

15   keystrokes, application information, Internet-use history,

16   email correspondence and chat communications.

17           You must not attempt to remove, tamper with, reverse

18   engineer or in any way circumvent the software slash hardware.

19   You must pay a special assessment of $100 which is due and

20   payable immediately.  The Court finds that the defendant does

21   not have the ability to pay a fine, so I waive the imposition

22   of a fine in this case.

23           Pursuant to Rule 32.2 of the Federal Rules of Criminal

24   Procedures, you must forfeit your interest in the following

25   property to the United States, three silencers taken from your

1    home, on January 29, 2021.  I pause for a moment.  The reason I

2    pause and am tapping my pen, is I believe the preliminary order

3    of forfeiture is consistent with the Plea Agreement, which

4    speaks of one silencer, but having made the relevant finding --

5    having made the finding that I did, with respect to relevant

6    conduct, I also find that the nexus extends to the remaining

7    two silencers, and therefore, order that this defendant's

8    interests in those three silencers is forfeited, and if I am

9    misremembering what the preliminary order of forfeiture said,

10   it's harmless, because I moved in the direction of coverage, as

11   opposed to shrinking coverage.

12         While I'm also off on a segue, let me say to

13   Ms. Means, I actually do recognize these conditions, with

14   respect to computers, and you can include the addition that you

15   made in my book of conditions, because I know, these are mine,

16   I don't know if anybody else is using them, but I know where

17   they came from and I know what case it came from.

18         All right.  Back to you, Mr. Collins, you are advised

19   of your right to appeal the sentence.  If you desire to appeal

20   a Notice of Appeal must be filed with the Clerk of the Court

21   within 14 days after entry of judgment or the right to appeal

22   will be lost.  If you are unable to afford an attorney for an

23   appeal, the Court will appoint one to represent you.  If you so

24   request, the Clerk of the Court must immediately prepare and

25   file a notice of appeal on your behalf.

1          I just told you that you have the right to appeal.

2    I'm also reminding you that your Plea Agreement with the

3    government contained a waiver of certain appellate rights.  I

4    refer you to Mr. Kraut for any further discussion of how those

5    two things interact with one another.

6          The defendant is in Marshal's custody.  He is remanded

7    to their custody.

8          Is there anything further on behalf of the government?

9          MS. SURRATT:  Not from the government, Your Honor.

10   Thank you.

11         THE COURT:  Or on behalf of the defendant?

12         MR. KRAUT:  The only thing I can think of is the

13   subpoena that was issued, I believe, is now moot.

14         THE COURT:  Say what?

15         MR. KRAUT:  The subpoena -- Ms. Surratt and I were

16   discussing, during the break, the subpoena duces tecum.

17         THE COURT:  I'm not even remembering what we're

18   talking about.

19         MS. SURRATT:  Your Honor, Mr. Kraut request that the

20   Court issue a subpoena to CBP for records, and he and I have

21   been going back and forth now for months --

22         THE COURT:  Oh, oh, oh, oh, oh, okay.  That was way

23   back when you were trying to get the -- the interview, if you

24   would.

25         MR. KRAUT:  Right.

1          *THE COURT:*  Yeah, that's moot.

2          *MR. KRAUT:*  All right.

3          *THE COURT:*  All right.  Anything else?

4          *MR. KRAUT:*  Um, no, Your Honor.  Thank you.

5          *THE COURT:*  All right.  Recess.

6          *THE COURTROOM DEPUTY:*  All rise.  Court is in recess.

7      (Recess at 12:00 p.m.)

8                        REPORTER'S CERTIFICATE

9

10          I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

11

12          Dated at Denver, Colorado, this 30th day of October,

13   2022.

14                              s/Tammy Hoffschildt

15                              _____

16                              Tammy Hoffschildt, FCRR,RMR,CRR

17

18

19

20

21

22

23

24

25